# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J. Fisher, Jr.                                          Elisabeth A. Shumaker
Clerk                                                           Chief Deputy Clerk

August 14, 1998

**TO:** ALL RECIPIENTS OF THE OPINION
**RE:** 96-3250, 96-3345, *ANR Pipeline Co. v. Lafaver*
Filed on July 21, 1998

The slip opinion filed on July 21, 1998, contains four minor clerical errors. Please note the following corrections:

1. On page one, "MARY I. CARLSON, Edwards County Commissioner" should be corrected to read "MARY I. CARLSON, Edwards County Treasurer".

2. On page two, "MARILYN K. BROWN, Jackson County" should be corrected to read "MARILYN K. BROWN, Jackson County Treasurer".

3. On page three, the name of counsel appearing for the appellants should be corrected to read "William E. Waters".

4. On page three, Richard D. Greene, appearing for the appellees, is a member of the firm Morris, Laing, Evans, Brock & Kennedy.

A corrected copy of pages one, two and three of the opinion are attached for your convenience.

Sincerely,
Patrick Fisher, Clerk


Keith Nelson
Deputy Clerk


encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

ANR PIPELINE COMPANY and COLORADO
INTERSTATE GAS COMPANY,

    Plaintiffs - Appellees,

v.

JOHN D. LAFAVER, Secretary of the Kansas
Department of Revenue, in his official capacity;
KANSAS DEPARTMENT OF REVENUE; MARK S.
BECK, Director of the Division of Property Valuation
of the Kansas Department of Revenue, in his official
capacity; DIVISION OF PROPERTY VALUATION
OF THE KANSAS DEPARTMENT OF REVENUE;
and their respective predecessors and successors in
office,

    Defendants - Cross-claim defendants -
    Appellants,

and

BROWN COUNTY BOARD OF COUNTY
COMMISSIONERS; JUDY GRATHWOHL, Brown
County Treasurer; CLARK COUNTY BOARD OF
COUNTY COMMISSIONERS; COLEEN Z. BROWN,
Clark County Treasurer; COMANCHE COUNTY
BOARD OF COUNTY COMMISSIONERS; VELMA
BASNETT, Comanche County Treasurer;
DICKINSON COUNTY BOARD OF COUNTY
COMMISSIONERS; LOUISE HABACKER,
Dickinson County Treasurer; EDWARDS COUNTY
BOARD OF COUNTY COMMISSIONERS; MARY I.
CARLSON, Edwards County Treasurer; FINNEY
COUNTY BOARD OF COUNTY COMMISSIONERS;

Nos. 96-3250
&
96-3345

RAYLENE NELSON, Finney County Treasurer; FORD COUNTY BOARD OF COUNTY COMMISSIONERS; DOROTHY HUNTER, Ford County Treasurer; GEARY COUNTY BOARD OF COUNTY COMMISSIONERS; KATHY TREMONT, Geary County Treasurer; GRANT COUNTY BOARD OF COUNTY COMMISSIONERS; RITA GEE, Grant County Treasurer; GREELEY COUNTY BOARD OF COUNTY COMMISSIONERS; MARY D. GENTRY, Greeley County Treasurer; HAMILTON COUNTY BOARD OF COUNTY COMMISSIONERS; CHRIS SQUIRE, Hamilton County Treasurer; HASKELL COUNTY BOARD OF COUNTY COMMISSIONERS; NANCY WEEKS, Haskell County Treasurer; JACKSON COUNTY BOARD OF COUNTY COMMISSIONERS; MARILYN K. BROWN, Jackson County Treasurer; KEARNEYCOUNTY BOARD OF COUNTY COMMISSIONERS; HOLLY LASHMET, Kearney County Treasurer; KIOWA COUNTY BOARD OF COUNTY COMMISSIONERS; ELSIE HARALDSON, Kiowa County Treasurer; MCPHERSON COUNTY BOARD OF COUNTY COMMISSIONERS; BRENDA BECKER, McPherson County Treasurer; MEADE COUNTY BOARD OF COUNTY COMMISSIONERS; WYNEMA DYE, Meade County Treasurer; MORTON COUNTY BOARD OF COUNTY COMMISSIONERS; LOIS HALL, Morton County Treasurer; NEMAHA COUNTY BOARD OF COUNTY COMMISSIONERS; ROSE M. WILHELM, Nemaha County Treasurer; POTTAWATOMIE COUNTY BOARD OF COUNTY COMMISSIONERS; LINDA HORGAN, Pottawatomie County Treasurer; PRATT COUNTY BOARD OF COUNTY COMMISSIONERS; DONNA SHELITE, Pratt County Treasurer; RENO COUNTY BOARD OF COUNTY COMMISSIONERS; LARRY R. TUCKER, Reno County Treasurer; RICE COUNTY BOARD OF COUNTY COMMISSIONERS; LILA BLACKBURN,

Rice County Treasurer; RILEY COUNTY BOARD OF COUNTY COMMISSIONERS; R. EILEEN KING, Riley County Treasurer; SALINE COUNTY BOARD OF COUNTY COMMISSIONERS; KEITH LILLY, Saline County Treasurer; SEWARD COUNTY BOARD OF COUNTY COMMISSIONERS; JOE NEESE, Seward County Treasurer; STAFFORD COUNTY BOARD OF COUNTY COMMISSIONERS; LYNDA L. MCALLISTER, Stafford County Treasurer; STANTON COUNTY BOARD OF COUNTY COMMISSIONERS; PHYLLIS KISTLER, Stanton County Treasurer; STEVENS COUNTY BOARD OF COUNTY COMMISSIONERS; BELVA HICKEY, Stevens County Treasurer; WABAUNSEE COUNTY BOARD OF COMMISSIONERS; ELLA MAE KRAUS, Wabaunsee County Treasurer; and all their respective predecessors and successors in office,

Defendants - Cross-Claim plaintiffs.

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 96-1089-JTM)**

---

William E. Waters, Kansas Department of Revenue, Topeka, Kansas, for defendants - cross-claim defendants - appellants.

Richard D. Greene, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kansas, (Rebecca H. Noecker and Karen L. Pauley, Colorado Interstate Gas Co., Colorado Springs, Colorado, on brief), for plaintiffs - appellees.

---

Before **ANDERSON**, **EBEL** and **KELLY**, Circuit Judges.

- 3 -

**EBEL**, Circuit Judge.

This appeal involves the efforts of two natural gas pipelines, in the face of burgeoning economic competition in the deregulated energy industry, to deal with what they regard as the unequal property tax system in Kansas vis-a-vis the pipelines' traditional competitors, railroad companies, as well as the pipelines' claims of unfair judicial process in the state courts of Kansas. We must dismiss this appeal, vacate the district court's judgment, and direct the district court to dismiss all claims in this case against both the state agency defendants and the state official defendants. The Eleventh Amendment stands as a bar to federal jurisdiction over all of these claims, and the plaintiffs' suit is not saved by the Ex parte Young doctrine.

## Background

These two appeals arise out of a single district court order denying a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction, filed by the state agency defendants and the state official defendants (collectively referred to as "state defendants") two weeks after the plaintiffs filed

this suit.[1]  The state defendants filed one appeal, No. 96-3250, as an "appeal by right" based on the district court's denial of the state defendants' claim of sovereign immunity under the Eleventh Amendment.  Subsequently, the state defendants also filed a separate motion seeking permission to file a second interlocutory appeal challenging that portion of the court's decision involving the Tax Injunction Act and the Rooker/Feldman doctrine.  The motion was granted, and this second appeal was denominated No. 96-3345.  Despite this procedural division of the issues between the two separate appeals, we believe the interests of justice would be best served by consolidating both appeals and disposing of this case in a single opinion.[2]

---

[1] A second group of defendants, involving most of Kansas' county commissioners and county treasurers [hereinafter the "county defendants"], were parties below but they have not filed their own interlocutory appeal in this case. As a result, this opinion is limited solely to the question of jurisdiction over the state defendants.

Following oral argument, the plaintiffs-appellees filed an uncontested motion with this court to dismiss the state agency defendants from this case.  In light of our resolution of this appeal, it is apparent that the plaintiffs-appellees cannot maintain this federal action against the state agency defendants. Accordingly, we grant the plaintiffs-appellees' motion to dismiss the Kansas Department of Revenue and the Kansas Division of Property Valuation as defendants.

Based on this ruling, then, the only defendants still germane to this appeal are the two state official defendants:  the secretary of the Department of Revenue and the director of the Division of Property Valuation.

[2] As a result, we direct the Clerk to consolidate these two appeals.

1.  The 4-R Act.

The seeds of this property tax dispute were planted in the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), Pub. L. 94-210, 90 Stat. 31 (codified as amended at 49 U.S.C. § 11501 (1994)).  Under this legislation, Congress prohibited state and local taxing agencies from imposing discriminatory taxes on railroads.  See 49 U.S.C. § 11501(b).  The legislation generated vast amounts of litigation in which railroads alleged that various taxing schemes by states and local governments violated the 4-R Act.  See, e.g., Burlington N. R.R. Co. v. Huddleston, 94 F.3d 1413 (10th Cir. 1996) (the most recent Tenth Circuit case on 4-R Act).  One of those 4-R Act lawsuits involved a challenge by railroads operating in Kansas against the state's taxation scheme for the railroads' personal property.  On August 11, 1989, that litigation was resolved with a consent decree that required the Kansas Division of Property Valuation to exempt 80% of the railroads' personal property from the tax roll, and then to levy a 30% tax assessment on the remainder of the railroad's real and personal property.

Seeing this dramatic tax break for their competitors, several natural gas pipeline companies requested similar treatment from the Kansas Division of Property Valuation, but the state refused.  The pipeline companies then went to court.  From the outset of the litigation underlying these appeals, the pipeline

companies have argued that they are similarly situated vis-a-vis the railroad companies, i.e., that both are public utilities under Kansas law. See Kan. Stat. Ann. §§ 79-5a01(a)(1) & (a) (4) (1989). The pipelines argue that they have an equal protection right to the same tax breaks provided to the railroads. See U.S. Const., XIV amend., § 1.

Key to the pipelines' equal protection claim is their concomitant allegation that they were denied procedural due process by the tax appeal proceedings in Kansas at both the administrative and judicial level. For this reason, the sequence of events in the underlying litigation is important.

## 2. The pipelines' state-court litigation.

After the August 11, 1989, consent decree exempting much of the railroads' Kansas personal property from taxation, the pipelines filed suit in Shawnee County District Court claiming their 1989 tax assessment by the Kansas Division of Property Valuation violated state and federal guarantees of equal protection. In an unreported decision, the state district court dismissed the suit for lack of subject-matter jurisdiction because the pipelines had failed to file an appeal of the assessment before the Kansas Board of Tax Appeals ("BOTA"). In 1993, the Kansas Court of Appeals reversed the district court's decision and remanded the case for consideration of the pipelines' equal protection arguments. See Colorado

- 7 -

Interstate Gas Co. v. Beshears, 860 P.2d 56, 61-62 (Kan. Ct. App. 1993) [hereinafter "CIG I"] (holding that the failure to exhaust administrative remedies was no bar to jurisdiction when no actual administrative remedies were available).

During the pendency of this first case, the pipelines filed appeals of their 1990 and 1991 tax assessments with BOTA, again claiming that the lack of favorable exemptions for themselves, vis-a-vis the railroads, violated the pipelines' rights to equal protection. The 1990 and 1991 appeals were submitted to BOTA on a stipulated record, and the Board rejected the challenges. The pipelines appealed that decision to the Kansas Supreme Court, which affirmed the BOTA decision. See In re Appeal of ANR Pipeline Co., 866 P.2d 1060 (Kan.) [hereinafter "CIG II (ANR Pipeline)"], cert. denied, 513 U.S. 917 (1994). The Kansas Supreme Court held that any disparate treatment between the pipelines and the railroads – including the 80% exemption of personal property – was mandated by the 4-R Act. See id. at 1067-68. The court also held that Kansas' constitutional guarantees of equal protection and uniform taxation were preempted by the 4-R Act. See id. at 1066-68.

Just three days after the Kansas Supreme Court filed its decision in CIG II (ANR Pipeline), the Supreme Court of the United States filed a decision in an unrelated case dealing with a similar issue of state property tax exemptions for railroads under the 4-R Act. See Department of Revenue v. ACF Indus., Inc., 510

- 8 -

U.S. 332 (1994). In ACF Industries, the state of Oregon had denied a request for property tax exemptions filed by companies that lease railcars to railroads and interstate shippers. Id. at 335-36. The railcar companies argued that the failure of the state to extend its partial exemption of tangible property to the railcar companies – while the state provided partial exemptions to certain agricultural and other businesses – was a violation of the anti-discrimination provisions of the 4-R Act. See id. The Supreme Court disagreed, holding that the 4-R Act does not limit a state's discretion to exempt non-railroad property, but not railroad property, from ad valorem taxes of general application. See id. at 347-48.

In Kansas, the pipelines interpreted the Supreme Court's decision in ACF Industries as a frontal assault on the rationale of the earlier Kansas Supreme Court decision in CIG II (ANR Pipeline). Consequently, the pipelines filed a motion for rehearing in CIG II (ANR Pipeline), arguing that the Supreme Court's decision in ACF Industries seriously undermined the Kansas court's justification under the 4-R Act. The Kansas Supreme Court summarily denied the petition for rehearing without comment. The pipelines then filed a petition for a writ of certiorari, arguing in part that the Kansas decision in CIG II (ANR Pipeline) was inconsistent with the Supreme Court's decision in ACF Industries. The Supreme Court denied the certiorari petition without comment. See ANR Pipeline Co. v. Director of Property Valuation, 513 U.S. 917 (1994).

During the pendency of this CIG II (ANR Pipeline) litigation, the pipelines filed new appeals of their 1992 and 1993 tax assessments with BOTA. This time, in addition to their equal protection claims, the pipelines argued that the Kansas Supreme Court's decision in CIG II (ANR Pipeline) had been effectively overruled by the U.S. Supreme Court's decision in ACF Industries. The 1992 appeal was submitted on the basis of stipulated facts, but there was no stipulation with respect to the 1993 appeal. BOTA dismissed both appeals without taking any evidence on the question of the disparate treatment between the railroads and the pipelines. BOTA ruled that its decision must be controlled by the Kansas Supreme Court's ruling in CIG II (ANR Pipeline).[3]

The pipelines appealed again to the Kansas Supreme Court, this time on the basis of their 1992 and 1993 tax appeals, asking the court to instruct BOTA that CIG II (ANR Pipeline) was no longer controlling law. Instead, the Kansas Supreme Court ruled on the pipelines' constitutional claims. See In re Appeals of Colorado Interstate Gas Co., 903 P.2d 154 (Kan. 1995) [hereinafter "CIG III"].

---

[3]From the text of the BOTA ruling, it appears that the Board did not address the constitutional claims raised by the pipelines. The Board said that in CIG II (ANR Pipeline), "[t]he Kansas Supreme Court ruled that the 4-R Act only applies to railroads. . . . The taxpayer is not a railroad and thus, is not entitled to the similar tax treatment provided by the 4-R Act." The Board apparently did not address the pipelines' claim that whether or not the pipelines met the definition of a railroad, they were similarly situated with the railroads as public utilities, and as a consequence, they were entitled to equal treatment.

The Kansas Supreme Court held that the disparate treatment between the railroads

and the pipelines was rational because it arose from the negotiated settlement of

the initial 4-R Act litigation brought by the railroads:

> While the granting of the 80% personal property
> tax exemption may have been based upon the belief that
> the 4-R Act required it, a belief that may be false in
> light of the United States Supreme Court's decision in
> ACF Industries, the settlement represents a cost-benefit
> analysis of continued litigation. . . .
> We are not prepared to state that the granting of
> the 80% personal property tax exemption to the named
> railroads in protracted federal litigation, as part of a
> negotiated settlement discriminated against CIG and
> ANR.

Id. at 158-59.  On the basis of this legal conclusion, the Kansas Supreme Court

dismissed the 1992 tax appeal.  See id. at 159.  The court, however, remanded the

1993 appeal for factual findings.  See id. at 160.  The Kansas court held that it

was error to decide the 1993 tax appeal without an evidentiary hearing.  See id.


3.  The pipelines' federal court litigation.

Rather than file a petition for a writ of certiorari on this latest Kansas

Supreme Court decision, the pipelines filed the instant action in federal district

court.  The complaint asserted federal court jurisdiction under 28 U.S.C. § 1331

(federal-question jurisdiction) and 28 U.S.C. § 1343 (civil-rights jurisdiction) and

alleged that the Tax Injunction Act, 28 U.S.C. § 1341, was no bar to the federal

court's jurisdiction.[4] The pipelines' complaint involved the state's property tax valuations of their personal property from 1990 to 1993, alleging that those valuations violated the pipelines' federal equal protection and due process rights under the Fourteenth Amendment.[5] The pipelines' complaint requested money damages against the county defendants and declaratory and equitable relief against the state defendants. The declaratory relief sought was a declaration that "Defendants have and continue to wrongfully value, assess, tax, and retain excessive taxes paid by [the pipelines] that are substantially different from those valued, assessed, taxed, collected and retained from similarly situated taxpayers, without a rationally based legitimate state interest, in violation of the Equal Protection Clause of the United States." This declaratory judgment request also asked the district court to take the following action: "to declare that [the Division of Property Valuation] should recertify to Counties for subject and future tax

---

[4]The pipelines sought and received permission to amend their original complaint, but the additional claims in the amended complaint were not before the district court when it considered the state defendants' motion to dismiss, and as a consequence, those claims are not before us in this appeal.

[5]The pipelines also asserted state-law claims for violations of the Kansas Constitution's equal protection and uniform taxation clauses, as well as a claim under Kansas common law for unjust enrichment. However, following oral arguments, the pipelines submitted a motion in this court to dismiss these state-law claims against the state defendants, which we grant.

years lawful values which comply with state and federal constitutions."[6]

In response to this complaint, the county defendants filed cross-claim complaints against the state defendants, which the state defendants answered, and all the defendants filed various motions under Fed. R. Civ. P. 12(b)(1) asking the district court to dismiss the plaintiff's suit. The district court dismissed the county defendants' motions to dismiss in the same order on appeal here, but because the county defendants are not parties to this appeal, we decline to consider the district court's decision on those motions.

Finally, as the defendants' motions were pending in federal district court, the last installment of the Kansas state-court proceedings went forward in the Shawnee County District Court, where the state court took up the remand it had received with respect to the 1989 tax assessment in CIG I. The state filed a motion for summary judgment, arguing that the constitutional claims raised by the pipelines had been decided by the Kansas Supreme Court in CIG III. The pipelines, on the other hand, filed a motion for a stay pending the outcome in

---

[6]The pipelines' request for a "declaration" that the state "should recertify" the pipelines' tax assessment might be more accurately characterized as a request for an "injunction." However, the pipelines adamantly insist that they have not asked for injunctive relief; they insist that their complaint against the state defendants seeks only declaratory relief. (See Appellees Letter of Mar. 24, 1997 to Tenth Circuit Court of Appeals (responding to the appellant's submission of supplemental authority).) Nevertheless, the characterization of this form of relief as "declaratory" or "injunctive" is not dispositive to our resolution here, and thus, we need not wade into that muddy water.

federal district court on their federal-court claims, including their claim that the Kansas courts had failed to provide due process on the pipelines' equal protection claims. Without conducting a hearing on either motion, the state district court apparently issued an order dismissing the motion for a stay and granting summary judgment to the state on the basis of the Kansas Supreme Court decision in CIG III. In a second appeal to the Kansas Court of Appeals, the appellate court again reversed the district court, although we have no indication in the record before us of the basis of that unpublished decision or its instructions to the lower court. See Colorado Interstate Gas Co. v. Beshears, 951 P.2d 1324 (Kan Ct. App. 1998) (table disposition).

4. The federal district court's ruling.

In the face of this complex procedural history, the federal district court below issued the Memorandum and Order that is on appeal here: ANR Pipeline Co v. LaFaver, No. 96-1089-JTM, 1996 WL 363047 (D. Kan. June 26, 1996) [hereinafter "CIG IV"]. In denying all the various motions to dismiss, the district court held that its jurisdiction was not blocked by the Tax Injunction Act because the Kansas authorities had failed to provide a "plain, speedy, and efficient remedy" in the Kansas courts: "The pipelines consistently attempted to protect their rights under state law, yet in the end their constitutional claims were

- 14 -

essentially terminated without any consideration." Id. at *2. The district court said the defendants could not rely on the existence of Kansas' tax appeal procedures as proof that the state provided a plain, speedy, and efficient remedy "if the procedures are ignored in fact." See id.

The district court also ruled that the pipelines' claims in this case did not violate the Rooker/Feldman doctrine barring lower federal court review of state court decisions because the pipelines had narrowly focused their suit away from any federal court review of the Kansas Supreme Court's decisions in CIG II (ANR Pipeline) and CIG III. See CIG IV, 1996 WL 363047, at *3. The district court held that the claims in the separate federal lawsuit were an original action – rather than a collateral attack – "premised on the failure of the [Kansas] court to decide the constitutional issues raised by the pipelines." Id.

Finally, on the state defendants' claim of Eleventh Amendment immunity, the district court ruled that to the extent the pipelines sought money damages, their suit was actually against the county defendants, which are not arms of the state, and thus was not blocked by the Eleventh Amendment. See id. at *3. The district court held that the remaining claims against the state defendants came within the Ex parte Young rule under the Eleventh Amendment because these claims sought only prospective relief for a violation of "the constitutional guarantees of Kansas and the United States." Id. at *2.

- 15 -

Following the denial of their motion for reconsideration, the state defendants took the instant appeals. Despite the interlocutory nature of this case, we have appellate jurisdiction over the district court's ruling on the Eleventh Amendment issue under the collateral order doctrine of Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139 (1995). See also Garramone v. Romo, 94 F.3d 1446, 1452 (10th Cir. 1996) (allowing an interlocutory appeal from the denial of claim of Eleventh Amendment immunity under the collateral order doctrine). We also have appellate jurisdiction over the Rooker/Feldman and Tax Injunction Act issues under the certification procedures for interlocutory appeals based on 28 U.S.C. § 1292(b) and Fed. R. Civ. P. 56(c).[7] We review de novo a district court's consideration of subject-matter jurisdiction in the context of a Rule 12(b)(1) motion to dismiss, providing plenary review to issues under the Eleventh Amendment. See SK Finance SA v. La Plata County, Bd. of County Comm'rs, 126 F.3d 1272, 1275 (10th Cir. 1997) (dismissal on Rule 12(b)(1) standard); Powder River Basin Resource Council v. Babbitt, 54 F.3d 1477, 1483 (10th Cir. 1995) (dismissal on Eleventh Amendment/Ex parte Young doctrine).

---

[7]In its Memorandum Order denying the motion for reconsideration, the district court granted the state defendants' separate request for interlocutory certification of the appeal in No. 96-3345 under 28 U.S.C. § 1292(b).

## I. State sovereign immunity.[8]

Two landmark Supreme Court cases on the scope of a state's sovereign immunity under the Eleventh Amendment ultimately control the outcome of this case. See Idaho v. Coeur d'Alene Tribe, 117 S. Ct. 2028 (1997); Seminole Tribe v. Florida, 116 S. Ct. 1114 (1996). However, a portion of the pipelines' claims against the state defendants may be disposed of by relying on the Eleventh Amendment case law predating Coeur d'Alene Tribe and Seminole Tribe, and consequently we turn to those matters first.

### A. The Eleventh Amendment.

The text of the Eleventh Amendment was proposed and quickly adopted by

---

[8]We note that federal courts should avoid reaching the merits of a constitutional issue when the case may be decided on statutory grounds. However, in this case, we turn first to the constitutional issue of state sovereign immunity because it presents a controlling jurisdictional question that is antecedent to the other two issues raised on appeal, i.e., the Tax Injunction Act and the Rooker/Feldman doctrine.

First, the statutory limitations of the Tax Injunction Act are not jurisdictional; rather, they define the scope of remedies a federal court may grant in a suit challenging taxes levied under state law. See 28 U.S.C. § 1341. Second, although the Rooker/Feldman doctrine does indeed involve a jurisdictional issue, see Facio v. Jones, 929 F.2d 541, 543 (1991), in this case, the appellants' allegations of a due process violation are sufficient to avoid dismissal under the Rooker/Feldman doctrine. The appellants have made clear that their complaint in this case does not contest the finality of the Kansas Supreme Court's decision in CIG III, but rather, they complain about the procedural fairness of Kansas' review of claims in subsequent proceedings.

the states soon after the Supreme Court handed down its decision in <u>Chisolm v. Georgia</u>, 2 U.S. (2 Dall.) 419 (1793), which interpreted the diversity jurisdiction clauses in section 2 of Article III as abrogating sovereign immunity for the states. <u>See</u> <u>Seminole Tribe</u>, 116 S. Ct. at 1148-49 (Souter, J., dissenting) (reviewing the history of the passage of the Eleventh Amendment). In an obvious reference to Article III's use of the phrase "The judicial Power of the United States," the Eleventh Amendment reads as follows,

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const., XI amend. Although the language of the text does not require it, the Supreme Court consistently has interpreted the Eleventh Amendment as barring not only suits against a state by citizens of another state, but also suits against a state by that state's own citizens. <u>See</u> <u>Hans v. Louisiana</u>, 134 U.S. 1, 13-15 (1890); <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974). As the Court has noted, the Eleventh Amendment stands "not so much for what it says, but for the presupposition . . . which it confirms." <u>Blatchford v. Native Village of Noatak & Circle Village</u>, 501 U.S. 775, 779 (1991). That "presupposition" is the doctrine of sovereign immunity, i.e., that "'it is inherent in the nature of sovereignty not to be amenable to the suit of an individual <u>without its consent</u>.'" <u>Hans</u>, 134 U.S. at

- 18 -

13 (emphasis in original) (quoting The Federalist, No. 81 (A. Hamilton)).

Applying this notion of sovereign immunity, the Court has held that a citizen's suit against a state agency is barred by the Eleventh Amendment just as surely as if the suit had named the state itself. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Furthermore, it does not matter what form of relief a citizen might request in a suit against a state agency; even a suit solely for prospective injunctive relief when it is brought against a state agency qua state agency is barred by the amendment. See Cory v. White, 457 U.S. 85, 90 (1982).[9] Finally, when a suit seeks money damages against an official of a state agency, suing that official in his or her official capacity, then the "real party in interest" is the state, and the suit is barred by the Eleventh Amendment. See Edelman, 415 U.S. at 663.

There are two narrow exceptions to the doctrine of sovereign immunity as it is enshrined in the Eleventh Amendment: 1) A state may waive its Eleventh Amendment immunity by consenting to be sued, but only in the clearest and most unmistakable terms, and 2) Congress may abrogate the states' Eleventh Amendment immunity, but again, only by using the clearest and most unmistakable terms, and only when Congress is exercising a power granted to it

---

[9]It is on the basis of this holding in Cory that we grant the plaintiffs' motion to dismiss the claims against the state agencies.

by a constitutional amendment post-dating the Eleventh Amendment, i.e., principally section 5 of the Fourteenth Amendment. See Aaron v. Kansas, 115 F.3d 813, 814 (10th Cir. 1997) (discussing the impact of Seminole Tribe on case law under the Eleventh Amendment).

### B.  The Ex parte Young "exception."

### 1.  The traditional view.

A third route for a party to obtain relief against a state agency in federal court is the so-called Ex parte Young "exception" to the Eleventh Amendment, although in nominal form the rule is not an "exception" because the citizen's suit is not against the state, but rather it is a suit against a state official.  In such a suit, when a party seeks only prospective equitable relief – as opposed to any form of money damages or other legal relief – then the Eleventh Amendment generally does not stand as a bar to the exercise of the judicial power of the United States.  See Ex parte Young, 209 U.S. 123, 158-159 (1908); see also Coeur d'Alene Tribe, 117 S. Ct. at 2043 (O'Connor, J., concurring) ("The Young doctrine recognizes that if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity.")

Under the Ex parte Young legal fiction, when an official of a state agency

is sued in his official capacity for prospective equitable relief, he is generally not regarded as "the state" for purposes of the Eleventh Amendment and the case may proceed in federal court.[10]  See Green v. Mansour, 474 U.S. 64, 68 (1985) (reading Ex parte Young to hold "that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law").  In one of our own recent Eleventh Amendment cases, we explained the traditional view of the Ex parte Young doctrine:

> [W]hen a suit names a state official as the defendant, the Eleventh Amendment still bars the action if "the state is the real, substantial party in interest."  Whether the state is the real party in interest turns on the relief sought by the plaintiffs.  Suits that seek prospective relief are deemed to be suits against the official, while suits that seek retroactive relief are deemed to be suits against the state.

Powder River Basin, 54 F.3d at 1483 (quoting Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945)).

---

[10]This interpretation of the Ex parte Young doctrine sheds light on why an official-capacity suit against a state official is not always blocked by the Eleventh Amendment.  See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985).  It is certainly true that the Court declared in rather emphatic language in Graham that an official-capacity suit "is, in all respects other than name, to be treated as a suit against the [official's] entity."  Id. at 166.  This statement, however, cannot be interpreted to mean that an official-capacity suit against a state agency official always should be treated as a suit against the state.  As the Court quickly added in Graham, "official-capacity actions for prospective relief [against state officials] are not treated as actions against the State."  Id. at 167 n.14; see also Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10 (1989).

Of course, because of the important interests of federalism and state sovereignty implicated by the Ex parte Young doctrine, the rule has its limits. First, federal courts have no jurisdiction to entertain a suit that seeks to require the state official to comply with state law – only allegations of violations of federal law are sufficient to come within the Ex parte Young rule. See Pennhurst, 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. . . . We conclude that Young and Edelman are inapplicable in a suit against state officials on the basis of state law.").[11] Second, the doctrine will not go so far as to allow federal jurisdiction over a suit that seeks to redress past wrongs – only ongoing violations are covered. See Papasan v. Allain, 478 U.S. 265, 277-78 (1986) ("Young has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past. . . ."). Third, the doctrine does not allow a federal court to declare past state conduct unconstitutional when the only purpose for such a declaratory judgment would be its res judicata effect in a subsequent state-court proceeding; such a declaration would have the effect of adjudicating the liability issues in a damages

[11]On the basis of Pennhurst, we grant the plaintiffs' to dismiss their state law claims.

- 22 -

action against the state even though a direct federal suit for damages would be barred by the Eleventh Amendment.  See Green, 474 U.S. at 73.  And fourth, although the doctrine will allow injunctive relief that might have a substantial ancillary effect on a state treasury, it does not allow an award for monetary relief that is the practical equivalent of money damages, even if this relief is characterized as equitable.  See Edelman, 415 U.S. at 668 (holding that the Ex parte Young rule will not allow an award of "equitable restitution" when the "practical effect [is] indistinguishable in many respects from an award of damages" and when it is "measured in terms of a monetary loss resulting from a past breach").

These limitations on the Ex parte Young doctrine are well-settled, and they informed the Supreme Court's recent pronouncement that "We do not, then, question the continuing validity of the Ex parte Young doctrine."  See Coeur d'Alene Tribe, 117 S. Ct. at 2034.  Despite this pronouncement, the Court's decisions in Coeur d'Alene Tribe and Seminole Tribe mark a significant narrowing of the scope of the Ex parte Young doctrine.  See V-1 Oil Co. v. Utah State Dep't of Public Safety, 131 F.3d 1415, 1421 n.2 (1997) (recognizing that Seminole Tribe limited Ex parte Young, but affirming the continued vitality of the Ex parte Young doctrine).

## 2. New case law.

The first shift arose in Seminole Tribe, a case that involved a federal suit by an Indian tribe seeking to force the state of Florida to comply with provisions of the Indian Gaming Regulatory Act ("IGRA"). Seminole Tribe, 116 S. Ct. at 1121. In addition to naming the state itself as a party, the suit also named Florida's Governor Lawton Chiles and sought to invoke the Ex parte Young rule allowing for federal jurisdiction over claims for prospective injunctive relief against state officials. See id. at 1132. The Court, however, held that the Ex parte Young fiction should not be invoked where Congress "has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right. . . ." Id. The Court ruled that the federal courts are not free to imply the wide-ranging, judge-made remedial doctrine of Ex parte Young when Congress has seen fit to craft a significantly narrower statutory remedy. See id. at 1133 ("[T]he fact that Congress chose to impose upon the State a liability which is significantly more limited than would be the liability imposed upon the state officer under Ex parte Young strongly indicates that Congress had no wish to create the latter under [the IGRA].").

We read in Seminole Tribe an obligation for the federal courts to examine Congress' stated intent with respect to the scope of statutory remedies that may be available in any case where an Ex parte Young issue is raised. The crucial

inquiry is whether Congress has expressed an intent, through some kind of statutory scheme, to limit or prevent potential remedies in a private cause of action even though broader remedies might otherwise be available against the state through the Ex parte Young rule.  If so, then under Seminole Tribe, the federal courts are not ordinarily free to go beyond that congressional intent.

The second narrowing of the Ex parte Young doctrine arose in Coeur d'Alene Tribe, a case involving a federal suit by an Indian tribe seeking a declaratory judgment establishing its right to quiet enjoyment over the submerged lands of Lake Coeur d'Alene, in addition to seeking prospective injunctive relief against numerous Idaho state officials to prevent them from exercising the state's asserted regulatory jurisdiction over those submerged lands.  Coeur d'Alene Tribe, 117 S. Ct. at 2032.  The Court was badly fractured by the case,[12] but a majority of justices agreed that the Ex parte Young doctrine could not save the

---

[12]Justice Kennedy wrote the principal opinion for the Court, but key provisions of his opinion garnered only one other vote.  See Coeur d'Alene Tribe, 117 S. Ct. at 2031 (Kennedy, J., minority opinion, with Rehnquist, C.J., as to Parts II.B, II.C, and II.D).  The controlling concurrence by Justice O'Connor rejected Justice Kennedy's view that the Ex parte Young doctrine should be applied on a case-by-case approach.  See id. at 2043 (O'Connor, J., concurring in judgment, with Scalia, J., and Thomas, J.)  The dissent by Justice Souter rejected both Justice Kennedy's minority view and the position of common ground for the Court's majority, i.e., that the Ex parte Young doctrine may not be used to obtain prospective injunctive relief that is the functional equivalent of a quiet title action against a state, when that relief implicates special sovereignty interests.  See id. at 2047 (Souter, J., dissenting, with Stevens, J., Ginsburg, J., and Breyer, J.)

tribe's federal suit even though the tribe sought only prospective equitable relief and its suit did not run afoul of any of the other long-recognized limitations to the doctrine. See id. at 2042 (Kennedy, J., majority opinion). Instead, a majority of justices agreed that the tribe's requested injunctive relief would be the "functional equivalent" of a quiet title action against the state. See id. at 2040 (Kennedy, J., majority opinion); id. at 2043 (O'Connor, J., concurring). That kind of relief "implicates special sovereignty interests" that the federal courts must carefully evaluate, bearing in mind the fundamental place of state sovereignty in our federal system. See id. at 2040 (Kennedy, J., majority opinion). After cataloguing the deep historical roots, and the legal importance, of state regulatory control over, and public ownership of, streams and lakes, the Court ruled that the Ex parte Young doctrine may not be used to support prospective federal court injunctive relief against state officials when that relief is just as much an intrusion on state sovereignty as an award of money damages:

> It is apparent, then, that if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury. . . . The dignity and status of its statehood allows Idaho to rely on its Eleventh Amendment immunity and to insist upon responding to these claims in its own courts, which are open to hear and determine the case.

Id. at 2042 (Kennedy, J., majority opinion).

We read Coeur d'Alene Tribe as imposing an important new requirement on federal courts as part of the Ex parte Young analysis. In light of Coeur d'Alene Tribe, federal courts must examine whether the relief being sought against a state official "implicates special sovereignty interests." If so, we must then determine whether that requested relief is the "functional equivalent" to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment. In the end, we must not extend the Ex parte Young doctrine to allow a suit for prospective equitable relief when that relief would be just as intrusive, if not more so, into core aspects of a state's sovereignty.

### C. Kansas' state sovereignty over taxation issues.

With this understanding of the doctrine of sovereign immunity under the Eleventh Amendment, we now turn to the effect of that doctrine on the suit by the natural gas pipelines against the Kansas officials in charge of property tax valuations for the state of Kansas. In their suit, the pipelines have asked the court to declare that these state defendants "have and continue to wrongfully value, assess and retain excessive taxes" against the pipelines. They also have asked the court to declare that the director of the Division of Property Valuation "should recertify to Counties for subject and future tax years lawful values which comply with state and federal constitutions."

It is evident merely from reading the text of these requests for declaratory relief that at least a portion of the requested relief runs afoul of some of the long-accepted principles of the Ex parte Young doctrine.  As discussed above, federal courts may not invoke Ex parte Young in order to consider claims for retrospective relief or claims that seek an adjudication of the legality of past state conduct.  See Papasan, 478 U.S. at 277-78.  The Ex parte Young doctrine applies only to continuing wrongs.  See id. at 278.  Furthermore, federal courts may not invoke Ex parte Young to render a declaratory judgment which merely has the practical effect of adjudicating retrospective liability issues that would otherwise arise in a suit for money damages.  See Green, 474 U.S. at 73.

On the basis of these two principles, we conclude that Ex parte Young cannot be invoked to preserve federal jurisdiction for that portion of the pipelines' equitable claims that seek retrospective relief.  Thus, there is no federal jurisdiction to declare that the state defendants have wrongfully valued the pipelines' property in the past.  And, there is no federal jurisdiction to declare that the state defendants should recertify past tax year assessments.  Both of those requests fall outside the scope of the Ex parte Young doctrine, and as a result, they fall squarely within the Eleventh Amendment's bar of sovereign immunity.

The only remaining claims that might lie within the Ex parte Young doctrine are the pipelines' requests for declarations as to the state defendants'

ongoing practices and the property valuations for future years. However, these claims run afoul of the doctrinal requirements of <u>Seminole Tribe</u> and <u>Coeur d'Alene Tribe</u>, and as a result, we conclude that these equitable claims also are barred by the Eleventh Amendment.

### 1. Prospective relief under <u>Seminole Tribe</u>.

According to <u>Seminole Tribe</u>, we must evaluate whether the equitable relief being sought through the <u>Ex parte Young</u> mechanism is broader than the relief Congress has otherwise circumscribed in relevant statutes. If so, the <u>Ex parte Young</u> mechanism for avoiding the Eleventh Amendment is not available.

Under the analysis required by <u>Seminole Tribe</u>, we find that the Tax Injunction Act, 28 U.S.C. § 1341 (1994), is the appropriate statute on which to base a comparison between the judge-made <u>Ex parte Young</u> doctrine and Congress' statutory scheme.[13] In the Tax Injunction Act Congress expressly limited the power of federal courts to issue certain types of remedies pertaining to the assessment, levy or collection of state taxes. Furthermore, we find that the

---

[13]We note that the 4-R Act is not the appropriate statute on which to make a comparison between the remedy available under <u>Ex parte Young</u> and the statutory remedies that Congress otherwise has circumscribed. In this case, the natural gas pipelines do not come within the scope of the 4-R Act because they do not possess the "rail transportation property" that is the subject of the 4-R Act. <u>See</u> 49 U.S.C. § 11501(a)(3). Hence, relief is not being sought under the 4-R Act nor does that act purport to limit the natural gas pipelines' claims asserted here under the United States Constitution.

- 29 -

criteria for relief under the Tax Injunction Act are significantly narrower than the criteria under Ex parte Young. As a result, we conclude that the Ex parte Young doctrine may not be invoked for the pipelines' prospective claims that seek relief that is precluded by the Tax Injunction Act.

The Tax Injunction Act provides that federal courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Thus, the Act clearly functions as a limitation on the equitable remedies a federal court may provide in a property tax dispute that otherwise has appropriate federal court subject-matter jurisdiction, i.e., federal question jurisdiction or diversity jurisdiction. Under the Tax Injunction Act, the only avenue by which a claim for injunctive relief against state or local taxes may be brought to federal court is where the state has failed to provide a "plain, speedy and efficient remedy." See id. The Act means that a state must provide a forum, according to the Supreme Court, that allows an "opportunity to raise constitutional objections" to the contested tax. See California v. Grace Brethren Church, 457 U.S. 393, 412 & n.26 (1982). A state remedy is "plain, speedy and efficient" if it "provides the taxpayer with a 'full hearing and judicial determination' at which [the taxpayer] may raise any and all constitutional objections to the tax." Id. at 411; see also Rosewell v. LaSalle Nat'l Bank, 450

U.S. 503, 512 (1980) ("On its face, the 'plain, speedy and efficient remedy' exception appears to require a state-court remedy that meets certain minimal procedural criteria."). In Rosewell, the Court held that the fact that the state procedure entails a two-year delay and the taxpayer may not get interest on any refund ultimately awarded does not make the remedy inadequate. See Rosewell, 450 U.S. at 512. Under the Act, if the state provides adequate procedural due process to allow a taxpayer to raise any constitutional objections, then the state has done all that is required under the Tax Injunction Act, and as a consequence, the federal courts are foreclosed from hearing such a tax challenge. See Grace Brethren, 457 U.S. at 412-13.

There is no such similar limit on the scope of the Ex parte Young doctrine. Indeed, it appears to be clear from the concurring and dissenting opinions in Coeur d'Alene Tribe that an Ex parte Young injunction still may issue even when the state courts would provide an adequate forum for the plaintiff's constitutional claims. See Coeur d'Alene Tribe, 117 S. Ct. at 2045 (O'Connor, J., concurring) ("Not only do our early Young cases fail to rely on the absence of a state forum as a basis for jurisdiction, but we also permitted federal actions to proceed even though a state forum was open to hear the plaintiff's claims.") (emphasis in original); id. at 2057 (Souter, J., dissenting) ("The [Kennedy] opinion's notion that availability of a state forum should have some bearing on the applicability of

Ex parte Young is . . . as much at odds with precedent as with basic jurisdictional principles."). Thus, under the Ex parte Young doctrine, a plaintiff still would be able to obtain prospective injunctive relief against a state official in a case where the Tax Injunction Act would bar the very same federal-court injunction because the state's remedy was "plain, speedy and efficient."

As a result, we cannot avoid the conclusion that when a state provides an adequate forum for a plaintiff's federal claims, the criteria for a remedy under Ex parte Young are broader than the criteria under the Tax Injunction Act.[14] On the basis of that conclusion, the rule in Seminole Tribe – that federal courts may not imply the judge-made remedy of Ex parte Young when Congress has provided a more narrowly circumscribed remedy – controls this case.[15] See Seminole Tribe, 117 S. Ct. at 1133. Thus, when a state provides an adequate forum to hear claims for injunctive relief against state taxes, there is no Ex parte Young mechanism

[14]Our conclusion on this question should not be interpreted as suggesting anything about the nature of the criteria for prospective injunctive relief in the opposite context when the state has failed to provide a plain, speedy, and efficient remedy. In that situation, which we do not face here, it may well be that the criteria for a remedy under Ex parte Young and the Tax Injunction Act are coextensive.

[15]It is worth pointing out that Congress enacted the Tax Injunction Act in part as a response to the Court's fashioning of the Ex parte Young remedy that allowed injunctive suits against state officials. See Rosewell, 450 U.S. at 522 n.28. Through the Tax Injunction Act, Congress intended to curtail the ability of private litigants to challenge their state tax bills in federal court through the Ex parte Young mechanism. See id.

available to avoid the Eleventh Amendment's prohibition of suits against unconsenting states.

Seeking an escape from this doctrinal logic, the pipelines allege that the Ex parte Young mechanism is still available for this suit because Kansas consistently has failed to provide an adequate state remedy. The district court agreed with both the conclusion and the premise of this argument. See CIG IV, 1996 WL 363047 at *2. We are inclined to disagree. Although the pipelines did not persuade the Kansas courts to give them the relief they sought, they did have the opportunity to raise all their constitutional claims, and in fact they availed themselves of such opportunities. An adequate state remedy only guarantees adequate due process access to the state courts; it does not guarantee victory to the taxpayer on the merits of the claims asserted. Nevertheless, we need not make a final decision as to the adequacy of Kansas' judicial procedures because the Court's decision in Coeur d'Alene Tribe compels the conclusion that the Eleventh Amendment bars the pipelines' suit.

### 2. Prospective relief under Coeur d'Alene Tribe.

In Coeur d'Alene Tribe, a majority of the justices clearly held that the Ex parte Young mechanism for federal-court injunctive relief is not available when the relief "implicates special sovereignty interests." Coeur d'Alene Tribe, 117 S. Ct. at 2040 (Kennedy, J., majority opinion). The Court held that the federal

judiciary cannot allow "a reflexive reliance on an obvious fiction" in the Ex parte

Young doctrine to overcome the "real limitation on a federal court's federal-

question jurisdiction" that is imposed by the Eleventh Amendment. See id. at

2034. Thus, the crucial question in this case comes down to whether a state's

power to assess and levy personal property taxes on property within its borders

"implicates special sovereignty interests."

In Coeur d'Alene Tribe, the Court sought to answer the question of whether

state ownership and regulation of submerged lands within its borders "implicates

special sovereignty interests" by reviewing the doctrines of sovereignty going as

far back as Justinian's Institutes. The Court catalogued the unique position of

state sovereignty over navigable waters that then existed in the English common

law and later was imported into the American legal system.

For our own purposes, we need not go so far as an inquiry into Roman law[16]

---

[16]We do note, however, that a state's sovereign power to tax its citizens has been a hallmark of the western legal tradition. This historical fact was clearly in the mind of the Framers when they considered the intertwining doctrines of sovereign immunity and a state's power to tax its citizens. As Alexander Hamilton explained in The Federalist,

> I am willing here to allow, in its full extent, the justness
> of the reasoning which requires that the individual
> States should possess an independent and uncontrollable
> authority to raise their own revenues for the supply of
> their own wants. And making this concession, I affirm
> that (with the sole exception of duties on imports and
> exports) they would, under the plan of the convention,

(continued...)

- 34 -

because Congress has done our work for us.  Congress has made it clear in no uncertain terms that a state has a special and fundamental interest in its tax collection system.  See Act of Aug. 21, 1937 (Tax Injunction Act), Pub. L. No. 332, 50 Stat. 738, ch. 726, § 1, (1937) (codified at 28 U.S.C. § 1341); see also S. Rep. 1035, 75th Cong., at 2 (1937) (noting that the Tax Injunction Act was intended to protect states from well-financed litigants who could "seriously disrupt State and county finances" by withholding tax payments during the course of federal-court litigation).  As the Supreme Court explained in Rosewell, the Tax Injunction Act "was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes."  Rosewell, 450 U.S. at 522.  The statute had its roots in Congress' recognition of "the imperative need of a State to administer its own fiscal operations."  Tully v. Griffin, Inc., 429 U.S. 68, 73 (1976).  We do not

---

[16](...continued)
> retain that authority in the most absolute and unqualified
> sense; and that an attempt on the part of the national
> government to abridge them in the exercise of it would
> be a violent assumption of power, unwarranted by any
> article or clause of its Constitution.

The Federalist, No. 32 (A. Hamilton).  This view of the singular importance of tax administration for the states recently was reiterated by the Court:  "We have long recognized that principles of federalism and comity generally counsel that courts should adopt a hands-off approach with respect to state tax administration." National Private Truck Council, Inc. v. Oklahoma Tax Comm'n, 515 U.S. 582, 586 (1995).

doubt, therefore, that a state's interests in the integrity of its property tax system lie at the core of the state's sovereignty. Indeed, where it is possible to imagine a state government continuing to maintain its sovereignty despite the lack of any ownership of land, cf. Coeur d'Alene Tribe, 117 S. Ct. at 2041, it is impossible to imagine that a state government could continue to exist without the power to tax.

Furthermore, we have no hesitation in concluding that the declaratory relief requested by the pipelines – i.e., that the state of Kansas should "recertify" its tax assessment of the pipelines' personal property in Kansas – is "fully as intrusive" into the state's sovereignty as would be a retroactive money judgment against excessive property taxes.[17] See id. at 2043. The pipelines' request to rewrite Kansas' property tax code with respect to its application against the personal

---

[17]The pipelines vehemently argue that their requested relief will not impose a drain on the treasury of the state of Kansas because the property taxes actually are collected and retained by the local counties. They further affirmatively waive any claim in their suit that might be interpreted as a request for money damages against the state. It appears, however, that a portion of the property taxes collected by the counties are passed along to the state to fund some state education programs, and the state defendants contend that this fact means the pipelines are requesting a money judgment against the state.

Despite the vigor of the parties' argument on this issue, we need not determine the particular downstream location of the disputed property tax revenues. The question under Coeur d'Alene Tribe is not whether a plaintiff's requested relief actually constitutes a call on the state treasury, but rather whether the requested relief is the "functional equivalent" of some form of legal relief that would be barred by the Eleventh Amendment. See Coeur d'Alene Tribe, 117 S. Ct. at 2040. We believe that a request to "recertify" property tax assessments actually is the "functional equivalent" of a money judgment against the state and it intrudes on the state's special sovereignty interests.

property of natural gas pipelines is certainly a major intrusion into Kansas' special sovereignty interests. The Eleventh Amendment stands as a barrier to such a request. The Eleventh Amendment requires that the pipelines' claims against the state of Kansas must be brought in state court.

The pipelines argue that it would be the height of injustice to require them to bring their federal constitutional claims in the state courts of Kansas when one of their claims is that Kansas has failed to provide the pipelines with minimal guarantees of procedural due process. Although we recognize the predicament the pipelines face, we are constrained by the Eleventh Amendment and the special sovereignty interest a state has in the control of its property tax system. The Supreme Court has held that in cases implicating the core powers of a state qua state, the Eleventh Amendment directs a litigant to the state's courts. Of course, a litigant always may seek review of the state court decisions by the U.S. Supreme Court through a petition for certiorari. See 28 U.S.C. § 1257. As lower federal courts, however, this court and the federal district court in Kansas may not entertain the pipeline's suit ultimately seeking federal declaratory relief against the tax policy of the state of Kansas. The relief sought by the pipelines impermissibly intrudes upon Kansas' "dignity and status" as a sovereign government.

## II. The state defendants' additional claims.

In addition to its holding under the <u>Ex parte Young</u> doctrine, the district court rejected the state defendants' other arguments against federal jurisdiction. The court held that the pipelines' suit was not barred by either the Tax Injunction Act or the <u>Rooker</u>/<u>Feldman</u> doctrine. See <u>CIG IV</u>, 1996 WL 363047, at *2, *3 (Aplt. App. at 215, 216-17). In light of our conclusion that the Eleventh Amendment extends the sovereign immunity of the state of Kansas as a bar against the pipelines' suit, we need not address these other issues. Instead, we must simply vacate the district court's decision. See <u>Aaron v. Kansas</u>, 115 F.3d 813, 818 (10th Cir. 1997) (vacating the district court's judgment after concluding that the Eleventh Amendment barred federal jurisdiction in the case).

## Conclusion

In the interests of judicial economy, we hereby CONSOLIDATE these two appeals, and we GRANT the appellees' motion to dismiss the named Kansas state agencies as defendants and to dismiss their state-law claims based on the Kansas Constitution and Kansas common law.

Furthermore, relying on the jurisdictional bar imposed by the Eleventh Amendment, we conclude that these appeals must be DISMISSED, the judgment of the district court VACATED, and the case REMANDED to the district court

with instructions to dismiss all claims against the remaining state defendants in this case.