F I L E D
United States Court of Appeals
Tenth Circuit

JAN 8 1999

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

TENT CIRCUIT

JULIE L. ELLIS,

      Plaintiff-Appellant/
      Cross-Appellee,

v.

UNIVERSITY OF KANSAS MEDICAL
CENTER; UNIVERSITY OF KANSAS;
KANSAS STATE BOARD OF
REGENTS; RICK ROBARDS; DAVID
LEWIN; ALICE P. HENDERSON, in
those individuals' official and individual
capacity,

      Defendants-Appellees/
      Cross-Appellants.

Nos. 96-3343 and 96-3344

ORDER

Before **BALDOCK, HOLLOWAY,** and **MURPHY,** Circuit Judges.

The court's slip opinion filed on December 21, 1998, is corrected as follows. On page 7, line three, the statutory citations are corrected to read "42 U.S.C. §§ 1981, 1983, and 1985,". On page 36, line 13, the claimed number of hours is corrected to "30". Copies of the corrected pages are attached to this order.

Entered for the Court
Patrick Fisher, Clerk of Court

By:    Keith Nelson
       Deputy Clerk

**F I L E D**
United States Court of Appeals
Tenth Circuit

**DEC 21 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JULIE L. ELLIS,

      Plaintiff-Appellant/
      Cross-Appellee,

v.

UNIVERSITY OF KANSAS MEDICAL
CENTER; UNIVERSITY OF KANSAS;
KANSAS STATE BOARD OF
REGENTS; RICK ROBARDS; DAVID
LEWIN; ALICE P. HENDERSON, in
those individuals' official and individual
capacity,

      Defendants-Appellees/
      Cross-Appellants.

Nos. 96-3343 and 96-3344

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 95-CV-2376)**

---

John B. Gage II, Overland Park, Kansas, for Plaintiff/Appellant/Cross-Appellee.

John C. McFadden, Special Assistant Attorney General, Kansas City, Kansas, for Defendants/Appellees/Cross-Appellants.

---

Before **BALDOCK, HOLLOWAY,** and **MURPHY,** Circuit Judges.

---

**HOLLOWAY,** Circuit Judge.

Plaintiff/Appellant/Cross-Appellee Julie Ellis (Ellis) brought this suit on August 25, 1995, against defendants in the United States District Court for the District of Kansas alleging violations of her rights under the First and Fourteenth Amendments and 42 U.S.C. §§ 1981, 1983, 1985 and 1988. On about August 30, 1995, the parties entered into a settlement agreement disposing of Ellis's substantive claims. Ellis subsequently moved for an award of attorney fees and costs, which defendants opposed. The district court granted Ellis's motion for fees and costs, but substantially reduced the amount of fees claimed. Memorandum and Order, App. at 205-07. Ellis appeals the reduction in fees and defendants appeal the district court's ruling to award any fees or costs. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**I**

**A**

Ellis, a white female, initially worked the day shift as a secretary in the Pharmacology Department of the University of Kansas' medical center. In January 1995, after obtaining admission to nursing school, Ellis interviewed with defendant Alice Henderson (Henderson) for a demotion to the position of night shift office assistant in patient admitting. App. at 10, 26, 47. Ellis advised Henderson that she was requesting the transfer and demotion in order to permit Ellis to attend nursing school during the day and work at night. Henderson granted the transfer and Ellis began working the night shift.

The minor controversy that escalated into the present lawsuit occurred in June 1995

2

when, on two occasions, Ellis advised her employer that she could not work due to illness. Id. at 10, 47. Subsequent to her two occasions of illness, Ellis received a paycheck that did not include two days' worth of wages. Ellis inquired in writing as to why her pay was reduced. She was informed by letter dated July 3, 1995, that the reduction was due to her failure to meet the four-hour call-in policy, which requires employees to provide at least four hours' prior notice of not being able to report for work. Id. at 28. After failing to obtain relief Ellis filed a formal grievance. Id. at 47-48.

Ellis's supervisor, Henderson, an African-American female, responded to Ellis's formal grievance with a series of memoranda dated July 17, 1995, (1) confirming the pay reduction due to Ellis's failure to properly report her intended absences, (2) admonishing Ellis for unprofessional conduct during a July 13, 1995, meeting regarding her grievance, (3) reducing Ellis's pay by an additional 40 minutes for failure to be present at her station on July 13, 1995, following the meeting, and (4) recommending that Ellis be suspended for three days without pay for repeated failures to report to work as scheduled. App. at 29-31. Defendant Rick Robards (Robards), Director of the Department of Human Resources, approved on July 26, 1995, Henderson's recommendation to suspend Ellis. Because Ellis had permanent status in the Kansas Civil Service system, Robards advised Ellis of her right to further appeal the matter to the Kansas Civil Service Board. Id. at 33.

Between July 17 and July 26, 1995, Ellis sought to dispute the claimed 40-minute absence at a suspension hearing by producing records of patient accounts upon which she had

3

recorded time entries. Id. at 48. Henderson then recommended to Robards on July 27, 1995, that Ellis be terminated for gross misconduct for revealing confidential patient information. Robards gave notice on July 28, 1995, to Ellis that he proposed her employment be terminated. Id. at 34, 37.

Ellis appealed her proposed termination to defendant David Lewin, the Appointing Authority's representative, asserting that the termination was in retaliation for Ellis's decision to exercise her rights under the Kansas Civil Service Act. Id. at 37, 49. On August 11, 1995, following Ellis's appeal, Robards notified Ellis that the proposed dismissal would be withdrawn and Ellis would be returned to her scheduled shift effective August 12, 1995.

On that date, Ellis returned to work her scheduled night shift but was handed a memorandum dated August 11, 1995, and authored by Henderson, advising Ellis that effective August 14, 1995, Ellis would be scheduled to work the day shift between 8:00 a.m. and 4:30 p.m. from Sunday through Thursday. Henderson reported in the memorandum that Ellis was needed "to support staffing on day shift during the absence of an employee who will be on medical leave." App. at 39, 49. Ellis attempted to grieve the transfer, asserting that defendants knew Ellis was due to begin her classes at nursing school on August 28, 1995. Id. at 49.

Pursuant to University policy, Ellis met with Henderson to discuss the transfer memorandum, inquiring why another night shift employee who had expressed an interest in switching to the day shift was not transferred. Henderson told Ellis that the night supervisor

did not want Ellis working the night shift.    Id.[1]  Because working the day shift would preclude Ellis from attending her nursing classes,[2] Ellis sought prompt action to return her to the night shift.

Believing that she might be the victim of racial discrimination and retaliation for exercising her legal rights, Ellis sought the advice of counsel on August 1, 1995, and retained John Gage on August 21, 1995,[3] when it became apparent to her that defendants would not consent to transfer her back to the night shift.  Ellis gave Gage a $500 retainer and agreed to pay a fee of $150 per hour. Id. at 126.

On August 22, 1995, Ellis signed charges of race discrimination and retaliation, which Gage transmitted to the Kansas Human Rights Commission the following day. Id. at 126-27. Gage contacted Lewin by telephone on August 22 and 23, advising him that Henderson had effectively undermined the decision not to terminate and constructively discharged Ellis by transferring Ellis back to the day shift, knowing that Ellis would not be able to work due to her nursing school class schedule.  Id. at 127.  Gage expressed Ellis's position that

---

[1]Ellis was later informed that the transfer was implemented in order to monitor Ellis's attendance problem. Id. at 50.

[2]If Ellis missed her scheduled classes, she could be disqualified for one year from attending nursing school. Thus the transfer to the day shift could severely impact her pursuit of a degree in nursing. Id. at 40-44, 50-53.

[3]The record indicates that prior to retaining Gage, Ellis had contacted Judy Simon, an attorney, beginning August 1, 1995, to discuss her problems with defendants. Simon referred Ellis to Gage, who initially consulted with Ellis on August 1, 1995.  App. at 131.  As discussed more fully below, Ellis sought to recover fees for services provided by Simon in connection with the referral to Gage. Id.

5

Henderson's action was motivated by race discrimination and retaliation for Ellis having exercised her right to grieve unfavorable decisions by defendants.  Id.

Lewin advised Gage on August 23 that neither he nor Robards would interfere with Henderson's decision to transfer Ellis to the day shift and that Ellis's only available recourse was to file a complaint with the Civil Service Board, the Kansas Human Rights Commission, or the courts.  Id.

**B**

Gage filed the instant suit on Ellis's behalf on August 25, 1995, against the University's medical center and several employees of the center in their individual and official capacities under the First and Fourteenth Amendments and 42 U.S.C. §§ 1981, 1983, 1985 and 1988.  Id. at 8-9.  That day Gage also filed a motion for a temporary restraining order (TRO) as well as a motion for a preliminary injunction, seeking to enjoin defendants from carrying out the decision to transfer Ellis to the day shift.  Id. at 40.  The judge scheduled a hearing for August 28, the same day Ellis was scheduled to begin classes.  At the hearing the judge denied the TRO but scheduled a preliminary injunction hearing for September 20, 1995, noting that he might change his ruling and order Ellis restored to the night shift.  Id. at 101-104.

On August 30, 1995, defendants' counsel forwarded a letter to Gage offering to allow Ellis to return to the night shift in order to permit her to attend nursing school during the day; this was expressly contingent on no further attendance problems occurring.  Id. at 108.  In

6

return defendants demanded by letter that Ellis dismiss "the underlying lawsuit which seeks relief pursuant to 42 U.S.C. §§ 1981, 1983, and 1985," withdraw her application for a preliminary injunction, and withdraw her charge of racial discrimination filed with the Kansas Human Rights Commission. Id. at 108, 127-28.

An affidavit of Gage states that he phoned Ellis and told her that, in his opinion, such a settlement offer that failed to address costs or attorneys' fees would not affect her right to claim fees and expenses as a prevailing party pursuant to 42 U.S.C. § 1988. App. at 127-28. Pursuant to Ellis's instruction, Gage transmitted on August 30, 1995, a notice of acceptance on the terms stated in the offer to defense counsel. Id. at 109, 128. Ellis further advised defendants in this transmittal that she would return to the night shift on September 10, 1995. Id. at 108-09. Nothing in this correspondence made any mention of fees or costs.

Ellis then moved to withdraw her motion for a preliminary injunction on September 13, 1995, which request the district court granted on September 20. App. at 3. Although the parties agreed to settle the matter at the end of August 1995, a settlement agreement and release of claims was not signed by Robards on behalf of defendants until January 26, 1996. Ellis did not sign the agreement until February 27, 1996. The signed six-page "Settlement Agreement and Release of Claim" made no mention of fees or costs. Id. at 159-64.[4] Gage forwarded the settlement agreement along with the stipulation for

_____

[4]The document is captioned "Settlement Agreement and Release of Claim." We note that the first paragraph of the document reads:

dismissal to defense counsel. The stipulation was not filed until May 9, 1996. On

February 28, 1996, Gage participated in a scheduling conference by telephone with

Magistrate Judge Rushfelt; Gage was the only counsel on the phone. Gage advised the judge

that the case had been settled except for Ellis's claim for attorney fees under 42 U.S.C.

§ 1988. See Report and Recommendation of Magistrate Judge Rushfelt at 1, Supp. App. at

1.[5]

While the parties had agreed to the settlement outlined above, five days after the suit

---

> This Settlement Agreement and Release of Claims (hereinafter referred to as 'Agreement,' made and entered into this 27th day of February, 1996, by the undersigned: . . ."

We add the emphasis under the "s" on "Claims." Later in the document in the recitations of agreements made, it is stated:

> It is further agreed that in the event any part of this Settlement Agreement and Complete Release of All Claims shall be declared invalid, it shall not affect the validity of any terms or provisions of this Settlement Agreement and Complete Release of All Claims.

App. at 162 (emphasis added).

The concluding paragraph of the settlement instrument states:

> IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement and Complete Release of All Claims on the date first written above.

App. at 163 (emphasis added).

[5]On this court's own motion, a supplement to the record has been obtained consisting of this Report and Recommendation. Fed. R. App. P. 10(e). In part this instrument states: "Counsel for plaintiff orally reported that this case has been settled, except for an issue of attorneys' fees as authorized by 42 U.S.C. sec. 1988."

8

was filed, Ellis nevertheless moved to have default judgments entered against defendants on March 1, 1996.[6] Defendants filed a motion to dismiss on April 24 and a motion to set aside default on April 26.[7] Id. at 4-5. On May 9, the same day a stipulation for dismissal was filed, Ellis filed a brief opposing defendants' motion to dismiss. Id. at 5.

As noted in the civil docket below, Ellis also filed on May 9, 1996, her motion for attorney fees and costs. App. at 4-5. The motion itself is not included in the record. In a letter to defense counsel dated May 16, 1996, authored by Gage, Gage advised defendants that the "final tally of attorneys' fees I am requesting in settlement of plaintiff's claim as a 'prevailing party' under 42 U.S.C. § 1988 is $13,097.50. Costs amount to $334.16." App. at 220. Defendants responded by a letter dated May 28 declining to pay the claimed fees and costs and labeling any such claim "absurd." Id. at 222-24. Defendants took the position that the settlement agreement and release disposed of any potential claim for fees. Id. at 222. Defendants also responded on May 16, 1996, to the motion for fees by forwarding to Ellis, but not filing with the court, suggestions in opposition to the fee motion. Id. at 110-18.

On July 4, 1996, Ellis filed a lengthy memorandum in support of her request for fees

_____

[6]Notwithstanding the fact that the parties agreed to settle their dispute immediately following the filing of this action, Ellis continued to maintain on appeal that defendants were in default since September 1995, apparently because defendants did not file an answer to Ellis's complaint. Brief of Appellant at 16.

[7]The record does not indicate the district court ever ruled on these motions, apparently finding them moot. See Brief of Appellees at 6-7.

and costs, which is also not included in the record.[8]  Defendants claim that after they declined to pay Ellis's initial demand of $13,097.50 for fees and $334.16 in costs, Ellis filed her memorandum in which she increased the amount of fees claimed to $21,662.50.[9]  Defendants filed their opposition to Ellis's motion for fees and costs on July 18, 1996.

The district court entered an order on September 17, 1996, holding Ellis was entitled to attorney fees and costs, but finding the claimed amount of fees to be excessive and unreasonable.  The court awarded Ellis $3,000 in fees and $499.37 in costs.  Memorandum and Order at 14, App. at 207.  The amount awarded in costs is equal to the full amount claimed by Ellis.  Id. at 147.  Judgment was entered that day.

On appeal, Ellis complains of the district court's denial of her motion for an extension of time in which to file a reply to defendants' opposition to Ellis's requested fees and costs.  She also makes several claims of error with regard to the district court's reduction of her claimed fees.  Defendants cross-appeal, asserting the district court erred in awarding any amount of fees and costs to Ellis.

**II**

**A**

---

[8]The district court noted that this memorandum was 65 pages in length, with six attached exhibits.  The court stated that it considered "the 65-page memorandum alone to be sufficient evidence that the requested fees are excessive."  App. at 204-05.

[9]Although the memorandum in support of fees is not included in the record, Ellis's attorney's billing record dated July 3, 1996, reveals a total charge of $21,662.50 for professional services rendered.  App. at 131, 146.

10

**Ellis's Motion for Extension**

We first examine whether the district court erred in denying Ellis an extension of time in which to file a reply to defendants' opposition to her fee motion. Rule 6(b)(1) of the Federal Rules of Civil Procedure provides that the district court "for cause shown may at any time in its discretion" extend the time for filing a pleading. We "review the denial of a motion for extension of time made under [Rule 6(b)(1)] for abuse of discretion." Buchanan v. Sherrill, 51 F.3d 227, 228 (10th Cir. 1995).

Ellis claims that the denial of the extension worked a manifest injustice which denied her due process of law. We disagree. First, the district court did not preclude Ellis from filing a reply to defendants' opposition; it merely enforced its rules governing the timing of submissions and denied any enlargement. Second, we are unable to determine from the record whether there is any merit to Ellis's contention that she was unable to respond to new issues raised by defendants in their opposition to fees. Last, the record reveals that the trial judge granted Ellis at least four extensions to file her memorandum in support of fees. We hold that the judge did not abuse his discretion in denying Ellis the requested extension.

**B**

**The Claim for Attorneys' Fees and Costs**

Ellis also argues on appeal that the district court erred in reducing the fees she claimed. On cross-appeal, defendants argue that the district court erred in awarding any fees or costs. "We review the district court's award of attorney's fees for clear abuse of

11

discretion," but we review de novo the district court's "statutory interpretation or legal analysis that formed the basis of the award." Malloy v. Monahan , 73 F.3d 1012, 1017 (10th Cir. 1996). Moreover, "because the district court's ultimate determination as to the reasonableness of the fees awarded is a factual question, it [is] reviewed under a clearly erroneous standard." Beard v. Teska, 31 F.3d 942, 955 (10th Cir. 1994). In fashioning an appropriate fee award, we have cautioned the district courts to "provide a concise but clear explanation of [their] reasons for the fee award." Malloy, 73 F.3d at 1017 (citing Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)).

**1.**

**Ellis's Entitlement to Fees**

42 U.S.C. § 1988 provides that a court, in its discretion, may award a "reasonable attorney's fee" to the "prevailing party" in a 42 U.S.C. § 1983 action. 42 U.S.C. § 1988(b); see also Case v. Unified Sch. Dist. No. 233, Johnson County, Kan., 157 F.3d 1243, 1247 (10th Cir. 1998)("As the attorneys of prevailing plaintiffs in a civil rights action, the appellants were entitled to an award of attorney's fees, expenses, and costs associated with the prosecution of the case. See 42 U.S.C. § 1988; 28 U.S.C. § 1920."). Claiming that she was the "prevailing party" in settling her civil rights action against defendants, pursuant to 42 U.S.C. § 1988 Ellis filed her application for fees, along with her stipulation for dismissal with prejudice, on May 9, 1996.

Defendants opposed the fee application on numerous grounds: (1) Ellis is not a

12

"prevailing party" within the meaning of 42 U.S.C. § 1988; (2) even if Ellis is a prevailing party, she surrendered her right to pursue attorney's fees by entering into a valid, complete settlement agreement with defendants; and (3) the district court erred in awarding any fees once it determined that Ellis's fee request was excessive and unreasonable. We take each argument in turn.

**a.**

**"Prevailing Party" Status**

The district court rejected defendants' contention that Ellis is not a "prevailing party" entitled to fees under section 1988. A party may prevail within the meaning of the section either by obtaining an enforceable judgment or comparable relief through a consent decree or settlement. Farrar v. Hobby, 506 U.S. 103, 111 (1992). When a settlement agreement represents the termination of the case, a party may prevail for § 1988 purposes only if the agreement "materially alters the legal relationship between the parties." Texas St. Teachers Ass'n v. Garland Ind. Sch. Dist., 489 U.S. 782, 792-93 (1989).

The district court correctly used this circuit's two-prong "catalyst test" to determine whether a party prevails for purposes of § 1988 when it enters into a settlement agreement.[10]

_____

[10]Ellis argues that the catalyst analysis used by the district court was unnecessary. Under Farrar she claims she is the prevailing party because she succeeded on a "significant issue . . . which achieves some of the benefit [she] sought in bringing the suit." Farrar, 506 U.S. at 109. However, we have "continued to speak in catalyst terms post Farrar," and have rejected the interpretation advanced by Ellis that Farrar rendered the "'catalyst' theory nonviable as a basis for awarding fees" in a case such as this. Beard, 31 F.3d at 951; see also Kansas Health Care Assoc. Inc. v. Kansas Dept. of Social & Rehabilitation Servs.,

13

Foremaster v. City of St. George, 882 F.2d 1485, 1488 (10th Cir. 1989). The "catalyst test" requires the party claiming "prevailing party" status to show: (1) the legal action is causally linked to securing the relief obtained; and (2) the defendant's conduct in response to the action was required by law rather than a gratuitous response to a frivolous or groundless action. Id.; Beard, 31 F.3d at 952. Using the catalyst test, the district court concluded that Ellis was the prevailing party because defendants returned Ellis to the night shift in response to her lawsuit, defendants' response was not gratuitous, and the settlement agreement "materially altered the legal relationship between the parties . . . ." App. at 200.

We begin consideration of the "catalyst test" by examining the first prong. Because this inquiry is factual in nature we review the determinations for clear error. Beard, 31 F.3d at 952. The district court found "that defendants' decision to return plaintiff to the night shift was the direct result of plaintiff filing this lawsuit." App. at 198. We hold the district court did not clearly err in finding that Ellis has satisfied the first prong of the "catalyst test."

The second prong requires more scrutiny. Defendants assert that Ellis cannot satisfy the second prong because their response was merely gratuitous and motivated by a desire to avoid the nuisance of defending a lawsuit and an investigation by the EEOC and the Kansas Human Rights Commission. Defendants further contend that their action restoring Ellis to the night shift was not "legally required" because the defendants enjoy Eleventh Amendment

31 F.3d 1052, 1053 (10th Cir. 1994). Thus we conclude the district court correctly employed the two-prong "catalyst test."

14

immunity from Ellis's suit.

**(i)**

**The Eleventh Amendment**

We first address defendants' contention that Ellis cannot satisfy this second prong of the catalyst test because, as entities of the State of Kansas, their action in restoring Ellis to the night shift was not subject to being ordered in the federal court action due to Eleventh Amendment immunity.

In discussing whether the defendants' conduct in settling plaintiff's claims was required by law, the district judge here understandably relied on Ramirez v. Oklahoma Dept. of Mental Health, 41 F.3d 584, 589 (10th Cir. 1994), and its broad statement of the exception to the bar of the Eleventh Amendment where injunctive relief would govern only future action and remedy continuing violations of federal law. See Memorandum Opinion and Order at 6-7; App. at 199-200. As explained later, that broad statement in Ramirez must now be narrowed to conform to subsequent Supreme Court pronouncements, although our result in the instant case conforms to the conclusion on the Eleventh Amendment issue reached by the district judge here.

The Eleventh Amendment provides: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Though the text of the Amendment does not expressly so

15

provide, the Supreme Court has interpreted the Amendment to apply to federal question suits against a State brought in federal court by the State's own citizens. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 117 S. Ct. 2028, 2033 (1997); Hans v. Louisiana, 134 U.S. 1, 10 (1890); ANR Pipeline Co. v. LaFaver, 150 F.3d 1178, 1187 (10th Cir. 1998). The Amendment is implicated here because the University and its medical center are arms of the State of Kansas. K.S. 76-711; Brennan v. University of Kan., 451 F.2d 1287 (10th Cir. 1971).

Two circumstances exist where a citizen may sue a State in federal court without running afoul of the Eleventh Amendment. First, a federal court may hear such suits if the State has expressly waived its Eleventh Amendment protection and consented to such suit in the federal courts. The test for determining whether a State has waived its Eleventh Amendment immunity "from federal-court jurisdiction is a stringent one" and in "the absence of an unequivocal waiver specifically applicable to federal-court jurisdiction," we will not find that a State has waived its constitutional immunity. Atascadero St. Hosp. v. Scanlon, 473 U.S. 234, 241 (1985). Though Kansas has generally authorized suits against any state educational institution brought in state court, K.S.A. § 76-713, Kansas has not expressly consented to suit in federal court and we cannot imply a waiver of Eleventh Amendment immunity into the statute. Brennan, 451 F.2d at 1289; see also Atascadero St. Hosp., 473 U.S. at 241 ("Although a state's general waiver of immunity may subject it to suit in state court, it is not enough to waive Eleventh Amendment immunity absent a clear intention to

16

subject itself to suit in federal court."); Edelman v. Jordan, 415 U.S. 651, 673 (1974)(a waiver of Eleventh Amendment immunity will be found only when stated by the "most expressive language" or by such "overwhelming implications" as will leave no room for doubt); V-1 Oil Co. v. Utah St. Dept. of Pub. Safety, 131 F.3d 1415, 1421 (10th Cir. 1997); Amisub (PSL), Inc. v. Colorado Dept. of Soc. Servs., 879 F.2d 789, 792 (10th Cir. 1989), cert. denied, 496 U.S. 935 (1990).

Moreover, the fact that the defendants here entered into a settlement agreement with Ellis does not act as a waiver of the defendants' constitutionally protected immunity because the settlement agreement does not itself indicate, nor does the record otherwise reflect, an unequivocal intent to waive the immunity by the agreement. See Johns v. Stewart, 57 F.3d 1544, 1554 (10th Cir. 1995)(because constructive consent is insufficient, state's partial settlement does not constitute a waiver of Eleventh Amendment immunity in absence of unequivocal expression of a waiver); see also Saahir v. Estelle, 47 F.3d 758 (5th Cir. 1995)(state's participation in settlement agreement not sufficient to waive its sovereign immunity).[11]

Second, a State may have its Eleventh Amendment immunity abrogated by Congress if such abrogation was accomplished pursuant to a valid exercise of power by Congress. The Court in Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996), held that Congress may not

---

[11]Our conclusion here does not foreclose the possibility that a State may demonstrate an unequivocal intent to waive Eleventh Amendment immunity by participating in a settlement.

17

abrogate a State's Eleventh Amendment immunity by an exercise of power under the Indian Commerce Clause of Article I. Id. at 72-73 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."). However, Seminole Tribe recognized that Congress has the constitutionally permitted power to abrogate a State's Eleventh Amendment immunity in one circumstance -- when Congress acts pursuant to its enforcement power under section 5 of the Fourteenth Amendment. Id. at 72 n.15 (Congress' authority to abrogate a State's Eleventh Amendment immunity pursuant to section 5 of the Fourteenth Amendment is undisputed); ANR Pipeline, 150 F.3d at 1188.

In order to invoke the Fourteenth Amendment exception to the Eleventh Amendment's bar to federal court jurisdiction, Ellis must show that Congress, in clear and unmistakable terms, intended to abrogate a State's Eleventh Amendment immunity when it enacted 42 U.S.C. §§ 1981, 1983 and 1985.[12] Seminole Tribe, 517 U.S. at 55; ANR Pipeline, 150 F.3d at 1188; Aaron v. Kansas, 115 F.3d 813, 814 (10th Cir. 1997); Ramirez, 41 F.3d

---

[12]We note that the Supreme Court has held that the Eleventh Amendment does not bar an award for attorneys fees pursuant to 42 U.S.C. § 1988 because Congress specifically enacted the statute pursuant to section 5 of the Fourteenth Amendment. Hutto v. Finney, 437 U.S. 678, 693-94 (1978); see also Weaver v. Clarke, 933 F. Supp. 831, 835 (D. Neb. 1996), aff'd., 120 F.3d 852 (8th Cir. 1997), cert. denied, 118 S. Ct. 898 (1998). Here, a money judgment to be entered after further determinations on remand, against the individual defendants in their official capacities, will not run afoul of the Eleventh Amendment. But the fact that immunity has been abrogated as to 42 U.S.C. § 1988 does not excuse us from analyzing Eleventh Amendment issues with respect to the underlying civil rights claims in order to determine prevailing party status to meet the demands of § 1988 for an award of fees and costs.

at 588 ("[A]bsent an unmistakable waiver by the state of its Eleventh Amendment immunity, or an unmistakable abrogation of such immunity by Congress, the amendment provides absolute immunity from suit in federal court for states and their agencies . . . ."). The Supreme Court has previously held that Congress did not abrogate the States' Eleventh Amendment immunity when it enacted 42 U.S.C. § 1983. Quern v. Jordan, 440 U.S. 332, 345 (1979).[13] Thus, because Kansas has not unmistakably waived its Eleventh Amendment immunity, and Congress has not abrogated that immunity, the Eleventh Amendment bars Ellis's suit against Kansas and its state agencies in the federal courts.

The bar to federal court jurisdiction with respect to Kansas and its agencies applies both to claims for monetary and injunctive relief. V-1 Oil Co., 131 F.3d at 1420-21. We recognize that we previously held that despite the Eleventh Amendment, a claim for prospective injunctive relief to govern only future action may be maintained against a State agency that is an arm of the State, to remedy continuing violations of federal law. See Ramirez, 41 F.3d at 589. However, in its Seminole Tribe opinion in 1996, the Court has since instructed us that: "[t]he Eleventh Amendment does not exist solely in order to 'preven[t] federal-court judgments that must be paid out of a State's treasury,' . . . it also serves to avoid 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" Seminole Tribe, 517 U.S. at 58 (internal quotations and

---

[13]Of course Congress could abrogate a State's Eleventh Amendment immunity with respect to 42 U.S.C. §§ 1981, 1983 and 1985 because the statutes clearly fall within the confines of the Fourteenth Amendment.

citations omitted).  Defendants argue that in light of Seminole Tribe, it is "impermissible to seek injunctive relief against a state agency or a public official on the basis of federal statutes which clearly do not abrogate the state's entitlement to Eleventh Amendment immunity."  Brief of Cross-Appellants at 14.

We believe the defendants' interpretation of Seminole Tribe is too broad.  While the Eleventh Amendment bars federal court jurisdiction over a state agency for both money damages and injunctive relief, or a state official acting in her official capacity in a suit for damages, a suit for prospective injunctive relief against a state official acting in her official or individual capacity may still be brought in federal court pursuant to the Ex parte Young doctrine, subject to new limitations discussed in Seminole Tribe and noted below.

Ex parte Young holds that federal jurisdiction exists "over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law.'" Seminole Tribe, 517 U.S. at 73.  The rationale for the doctrine's existence is rooted in the Supremacy Clause: "Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause."  Green v. Mansour, 474 U.S. 64, 68 (1974).  The Supreme Court continues to recognize the validity of the Ex parte Young doctrine, Couer d'Alene, 117 S. Ct. at 2034 ("We do not . . . question the continuing validity of the Ex parte Young doctrine.").  Couer d'Alene, id. at 2038, noted that "where prospective relief is sought against individual state officers in a federal forum based on a

20

federal right, the Eleventh Amendment, in most cases, is not a bar." However the Court has recently recognized new limitations to the Ex parte Young doctrine which we must now consider. See ANR Pipeline, 150 F.3d at 1189.

First, the Supreme Court held in Seminole Tribe that a court should hesitate before casting aside Eleventh Amendment limitations and permitting an action against a State officer based on the Ex parte Young doctrine "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right . . . ." Seminole Tribe, 517 U.S. at 74 (emphasis added); see ANR Pipeline, 150 F.3d at 1189. We read from this pronouncement an "obligation for the federal courts to examine Congress' stated intent with respect to the scope of statutory remedies that may be available in any case where" an Ex parte Young issue is raised. ANR Pipeline, 150 F.3d at 1189.

We need not reach the issue whether Congress prescribed in §§ 1983 and 1985 a detailed remedial scheme barring application of Ex parte Young because Ellis' claims with respect to those remedial statutes arise under the Constitution.[14] The Court in Seminole Tribe stated:

> Where Congress has created a remedial scheme for the enforcement of a particular federal right, we have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary. Schweiker v. Chilicky, 487 U.S. 412, 423, 108 S. Ct. 2460, 2468, 101 L.Ed.2d 370 (1988) . . . Here, of course, the question is not whether a remedy should be created, but instead is whether the Eleventh Amendment

---

[14]As noted above, Ellis alleges in her complaint that the defendants deprived her of her equal protection and due process rights, secured by the Fourteenth Amendment, and her right to free speech, secured by the First and Fourteenth Amendments. App. at 16-24.

21

bar should be lifted, as it was in Ex parte Young, in order to allow a suit against a state officer. Nevertheless, <u>we think that the same general principle applies: therefore, where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right</u>, a court should hesitate before casting aside those limitations and permitting an action against an officer based upon Ex parte Young.

Seminole Tribe, 517 U.S. at 74 (emphasis added).  Use of the phrase "statutorily created right" indicates that the Court did not limit use of Ex parte Young as the means of enforcing a constitutional right.  Since §§ 1983 and 1985 did not create any substantive rights,  <u>see</u> Albright v. Oliver, 510 U.S. 266, 271 (1994), <u>and</u> Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979), but merely enforce existing constitutional and federal statutory rights, we hold that Seminole Tribe's "detailed remedial scheme" analysis does not apply here.

42 U.S.C. § 1981 does provide Ellis substantive rights.  <u>See</u> Meade v. Merchants Fast Motorline, Inc., 820 F.2d 1124, 1126 (10th Cir. 1987)("§ 1981 provided a substantive right against racial discrimination in employment . . . ."); <u>see also</u> Great American Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 377 (1979)("passage of Title VII did not work an implied repeal of the substantive rights to contract conferred by the same 19th-century statute and now codified at 42 U.S.C. § 1981."); Napoleon v. Xerox Corp., 656 F. Supp. 1120, 1123 (D. Conn. 1987)(§ 1981, unlike § 1983 and § 1985(3), creates substantive rights, as well as provide remedies.").  Thus we should consider whether § 1981 provides a "detailed remedial scheme" before Ex parte Young may be used as a remedy for a violation of the rights contained therein.

From our examination of § 1981, we see nothing that indicates a "detailed remedial

22

scheme" designed to limit or prevent potential remedies within the <u>Seminole Tribe</u> meaning. To us, the language of the statute indicates an intent by Congress not to limit the remedies available. Section 1981 provides in relevant part: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property enjoyed by white citizens . . . ." There is nothing in § 1981 that shows Congress intended to limit or bar remedies generally available to an aggrieved party. Our conclusion is bolstered by the Supreme Court's decision in <u>Johnson v. Railway Express Agency</u>, 421 U.S. 454, 460 (1975), where the Court stated: "[a]n individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory, and under certain circumstances, punitive damages."

<u>Second</u>, the Court recognized a further limitation on the use of <u>Ex parte Young</u> recently in <u>Idaho v. Couer d'Alene Tribe of Idaho</u>, <u>supra</u>. The Court held that a federal court cannot grant prospective injunctive relief under the <u>Ex parte Young</u> doctrine when that relief "implicates special sovereignty interests" that results in an intrusion "functional[ly] equivalent" to an award of money damages. <u>Couer d'Alene</u>, 117 S. Ct. at 2040.[15] Our court has noted that <u>Couer d'Alene</u> imposes a two-part inquiry to determine whether <u>Ex parte Young</u> may be used: first, whether the relief being sought against a state official implicates

_____

[15]The issue in <u>Couer d'Alene</u> was whether a Native American tribe could bring suit in federal court against state officials for prospective injunctive relief declaring the tribe the owner of submerged lands. 117 S. Ct. at 2033.

special sovereignty interests, ANR Pipeline, 150 F.3d at 1190; second, if the answer to the first question is in the affirmative, we then ask whether the requested relief is the functional equivalent "to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment." Id.

We are not persuaded that the claims asserted here under 42 U.S.C. §§ 1981, 1983 or 1985 implicate "special sovereignty interests." Buchwald v. University of New Mexico Sch. of Med., – F.3d –, 1998 WL 730156 *9 n.6 (10th Cir. 1998)(party's claims for injunctive relief to enjoin State from prospective use of residency criteria in medical school admissions does not implicate special sovereignty interests because "[t]here is certainly no threat that the New Mexico government would cease to exist without UNMSM's disputed policy."). There are no unusual or special interests of the State that are interfered with by granting Ellis injunctive relief pursuant to §§ 1981, 1983 and 1985. In Couer d'Alene, special sovereignty interests were implicated because granting the Native American tribe the prospective relief it requested would in effect divest Idaho of sovereign control over its submerged lands. 117 S. Ct. at 2041. In ANR Pipeline, granting the prospective relief would rob the state of its power to assess and levy personal property taxes on property within its borders. ANR Pipeline, 150 F.3d at 1193. We stated, "it is impossible to imagine that a state government could continue to exist without the power to tax." Id.

In sum, we hold that the Ex parte Young doctrine may be invoked here for Ellis's claim for prospective injunctive relief against the defendant state officials acting in their

official capacities.

## (ii)

## The Individual Defendants' Actions Were Required By Law

Having determined that the Eleventh Amendment does not bar federal court jurisdiction with respect to prospective injunctive relief against the individual defendants, we now consider a further question concerning the second prong of the catalyst test. We ask whether the individual defendants' actions in restoring Ellis to the night shift were required by law or wholly gratuitous. Our focus is on whether the record reveals the individual defendants' "conduct was required by law, *i.e.*, not a wholly gratuitous response to an action that in itself was frivolous or groundless." Beard, 31 F.3d at 952 (quoting J&J Anderson, Inc v. Town of Erie , 767 F.2d 1469, 1475 (10th Cir. 1985)). In this respect, the settlement agreement between Ellis and the defendants must have "materially [altered] the legal relationship between the parties by modifying the [defendants'] behavior in a way that directly benefits the plaintiff." Farrar, 506 U.S. at 111-12.

We agree with the district court that Ellis's lawsuit seeking prospective injunctive relief against the individual defendants was neither frivolous nor groundless and that the settlement agreement materially altered the legal relationship between Ellis and the individual defendants. Ellis had substantial allegations in her complaint that the individual defendants violated federal law by transferring her to the day shift at a time when they knew that she could not work such a shift due to her nursing class schedule. The trial judge

25

appeared to be concerned that Ellis's reassignment to the day shift amounted to a violation of her federal rights. At the hearing on Ellis's application for a TRO, the judge expressed his desire to promptly hold a hearing on Ellis's request for a preliminary injunction so that if the injunction were granted requiring Ellis to be reinstated to the night shift, the harm to Ellis would be minimal. App. at 102.

Accordingly we hold that Ellis's action against the individual defendants was not frivolous or groundless and that the individual defendants' action in restoring her to the night shift was not wholly gratuitous.[16] Thus, Ellis has satisfied the catalyst test with respect to the remaining individual defendants.

**b**

**The Settlement Agreement**

Defendants further argue on their cross-appeal that Ellis released them from any liability for attorneys' fees by executing a settlement and complete release of all claims. According to the defendants, the term "all claims" includes Ellis's request for attorneys' fees and expenses. We disagree and affirm the district court's ruling on this issue.

The district judge directly addressed the issue whether the settlement agreement waived and released Ellis's claim for attorneys' fees. Memorandum and Order at 12-13. The

---

[16]Although defendants cite other reasons for transferring Ellis back to the night shift, including a "desire to give one of its employees a second chance," Brief of Cross-Appellant at 11, we have said previously that the "lawsuit need not have been the sole reason for prompting" defendants to change their behavior as long as the suit was a "substantial factor or a significant catalyst" in making the decision. Foremaster, 882 F.2d at 1488.

26

order concluded as follows:

> Defendants also contend that plaintiff should not recover attorneys' fees because the terms of the settlement agreement released defendants from that obligation. The settlement agreement provides that plaintiff 'fully, finally and forever release, acquit and discharge defendants' from 'all liability, claims, actions, demands, suits or cause of action, which she has on account of the acts alleged in her civil complaint.' Defendant asserts that the discharge from 'all claims' includes plaintiff's request for attorneys' fees and expenses. The court disagrees.

> A party may waive its statutory eligibility for attorneys' fees as part of a settlement agreement. See Evans v. Jeff, 475 U.S. 717, 725 (1986) (waiver of § 1988 right to attorneys' fees in a class action); Chicano Police Officer's Ass'n v. Stover, 624 F.2d 127, 132 (10th Cir. 1980). Absent express language in the settlement agreement waiving the right to recover attorneys' fees, the intent of the parties governs. Brown v. General Motors Corp., Chevrolet Div., 722 F.2d 1009, 1012 (10th Cir. 1983).[17] In this action, the settlement agreement is silent regarding plaintiff's right to recover fees and expenses. Additionally, plaintiff's request for attorneys' fees does not constitute a new claim or cause of action against defendants because the recovery of fees and costs under § 1988 is not a separate action. Brown, 722 F.2d at 1012. The court concludes that plaintiff did not waive her right to pursue the recovery of her attorneys' fees and expenses in this matter.

App. at 205-06.

We feel that the district court properly applied the principles underlying 42 U.S.C. § 1988. The Supreme Court has held that a prevailing plaintiff in a civil rights action "should ordinarily recover an attorney's fee unless special circumstances would render an award unjust." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quoting Newman v. Piggie Park Enter., Inc., 390 U.S. 400 (1968)). The presumption in favor of attorneys' fees may be

---

[17]This Memorandum and Order mistakenly cites Brown as a Tenth Circuit opinion; it is a Second Circuit opinion.

27

overcome in a variety of ways, including a waiver of attorneys' fees by the prevailing plaintiff. Evans v. Jeff D., 475 U.S. 717, 720 (1986)(district court has the power, in its sound discretion, to refuse to award fees where settlement is conditioned upon waiver of attorneys' fees).

Here the settlement agreement is entirely silent on the issue of fees and costs. App. at 159-163.[18] Absent express language in the settlement agreement waiving the right to recover attorneys' fees, the intent of the parties governs. Brown v. General Motors Corp., Chevrolet Div., 722 F.2d 1009, 1012 (2d Cir. 1983).[19] When the language of a settlement agreement or release is inconclusive, as here, our examination must focus on whether such fees were discussed and intended to be covered by the settlement. See Chicano Police Officer's Assoc. v. Stover, 624 F.2d 127, 132 (10th Cir. 1980). In Chicano, we noted that the usual American rule is that attorneys' fees are not recoverable, citing Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240 (1975). We held, however, that Chicano presented a different case:

---

[18]In the circumstances before us, the use of the terms "all liabilities" and "all claims" in the settlement agreement need not necessarily be held to include attorneys' fees and costs. See Parker v. Metropolitan Water Reclamation Dist. of Greater Chicago, 782 F. Supp. 387, 388 (N.D. Ill. 1992). We agree with the view expressed by the district judge in the instant case, noted earlier, that the plaintiff here did not waive her right to pursue the recovery of her attorneys' fees and expenses. App. at 206.

[19]We are in agreement with the Ninth and Sixth Circuits that silence in a settlement agreement does not equal a waiver of a claim for attorneys' fees. Muckleshoot Tribe v. Puget Sound Power & Light Co. , 875 F.2d 695, 698 and n.5 (9th Cir. 1989); Jennings v. Metropolitan Gov. of Nashville, 715 F.2d 1111, 1114 (6th Cir. 1983).

28

The instant case is different, however; there is a statutory provision for awarding fees, and the importance of awarding attorneys' fees in making private enforcement of the Civil Rights Act possible has been consistently emphasized. Nevertheless, this is not one of those situations in which Congress has prohibited settlements covering payment of attorneys' fees. Therefore, plaintiffs can give up their statutory entitlement to fees as part of the settlement arrangement.

The settlement agreement here is at best ambiguous; the $16,000 payment could be construed as a settlement of all that is to be paid to plaintiffs *and their attorneys*. That is one of the questions to be determined on remand. The trial judge should conduct an evidentiary hearing on whether attorneys' fees were discussed and intended to be covered by the cash settlement. If not, the court should consider whether plaintiffs took actions to mislead defendant or otherwise were responsible for 'special circumstances' which would make an attorneys' fees award in their favor inequitable under the *Piggie Park* standard. If there was no agreement and no such conduct by plaintiffs, the court, without setting aside the settlement, should award attorneys' fees to plaintiffs, assuming it finds they prevailed under the standards above discussed, in order to carry out the congressional policy expressed in the Civil Rights Act.

Id. at 132 (emphasis in original).

We noted above the conclusions here by the trial judge, namely the court's rejection of the defendants' claim that the agreement discharged the request for attorneys' fees and expenses. App. at 205. The judge applied our Chicano ruling, noted above. Id. at 205-06. And he held that here the settlement agreement is silent on recovery of fees and expenses; that Ellis's request for fees does not constitute a new claim because recovery of fees and costs under § 1988 is not a separate action; and the judge concluded plaintiff did not waive her right to pursue recovery of her attorneys' fees and expenses here. App. at 206. We agree.

29

Here, the record reveals that settlement negotiations consisted solely of written communications containing no references to Ellis's claim for attorneys' fees and costs. App. at 108-09. Ellis asserts in her brief that the parties never discussed the § 1988 claim at "any time before or after execution of the Settlement Agreement and Release of Claim." Brief of Appellant at 14. Defendants do not contradict in their brief Ellis's assertion when they are discussing negotiations for the settlement agreement. Brief of Appellees at 2. The record also indicates that Ellis' counsel never revealed an intention to waive the fees, as evidenced by Gage's representation to the magistrate judge that all of Ellis' claims had been settled except for her claim for attorneys' fees under 42 U.S.C. § 1988. Defendants, on the other hand, vigorously argue that they would have never agreed to settle the case had the settlement not released them of all liabilities, including attorneys' fees and costs.

Thus, we must decide who must bear the loss where a settlement agreement of civil rights claims is silent on the issue of attorneys' fees and costs and the parties claim conflicting intentions. We believe that the "losing" party must shoulder the burden of showing that the parties mutually intended a settlement agreement to include a release of a § 1988 claim. See Muckleshoot Tribe, 875 F.2d at 698 ("Rather than adopting a rule requiring plaintiffs to reserve the right to sue, we [the Ninth Circuit], along with the Third Circuit, have made it clear that any party wishing to foreclose a suit for § 1988 fees must negotiate a provision waiving attorney's fees."); El Club Del Barrio v. United Community Corporations, 735 F.2d 98, 100 (3d Cir. 1984); cf. Valley Disposal, Inc. v. Central Vermont

Solid Waste Management Dist., 71 F.3d 1053, 1058 (2d Cir. 1995) (Valley I). This rule best

furthers the policy behind § 1988, which not only allows a civil rights claimant to pursue

meritorious constitutional claims without having to pay an attorney out-of-pocket, but also

encourages "competent attorneys to prosecute those claims." Valley Disposal, Inc. v. Central

Vermont Solid Waste Management Dist., 113 F.3d 357, 361 (2d Cir. 1997)(Valley II).[20]

Moreover, our result does not conflict with, but instead furthers, the presumption in favor of

awarding attorneys' fees.

Under this rubric, Ellis's claim for attorneys' fees and costs survives the settlement

agreement and release. As we hold above, defendants are not the prevailing party in this

action. Thus the burden rests with defendants to show the settlement agreement was intended

to release a claim for attorneys' fees and costs. El Club Del Barrio, 735 F.2d at 101 ("the

best rule of law would be one that places the burden [of showing the parties' intent on fees]

on the party losing the underlying litigation."). Defendants had ample opportunity to

---

[20]We note that some of our sister circuits have held that the prevailing party must show that a settlement agreement and release specifically does not waive a section 1988 claim. See Wray v. Clarke, 151 F.3d 807, 809 (8th Cir. 1998); Elmore v. Shuler, 787 F.2d 601, 603 (D.C. Cir. 1986). We respectfully disagree with the view that the burden of showing the disposition of a § 1988 claim lies with the prevailing party. Wray and Elmore fail to consider the disruption of the policies behind § 1988 caused by their conclusions. See Piggie Park, 390 U.S. at 401 ("If successful plaintiffs were routinely forced to bear their own attorney's fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts."); Albemarle Paper Co. v. Moody, 422 U.S. 405, 415 (1975)(citing Piggie Park, the Court reasoned that the strong public interest in having injunctive actions brought in order to remedy civil rights violations can only be vindicated if successful plaintiffs, acting as "private attorneys general," are awarded attorneys' fees in all but very unusual circumstances).

31

condition the settlement on a waiver of attorneys' fees. Moreover, they were on notice that Ellis had asserted a claim for attorneys' fees in her complaint. At oral argument of this appeal, defense counsel conceded he missed the point, he was busy, and he could not imagine fees being demanded.

In sum, we are convinced that the judge correctly held that Ellis did not waive her claim for attorneys' fees and costs by the settlement agreement.

**2.**

**Reasonableness of Fee Award**

Having determined that Ellis is entitled to seek attorney's fees from the individual defendants, we turn now to Ellis's claims of error regarding the district court's calculation of allowable hours and a reasonable rate. We also address defendants' remaining claim that since Ellis submitted an "outrageously" excessive fee request, the district court should have summarily denied her motion.

"[O]nce a party has established its entitlement to fees as a 'prevailing party' . . . '[i]t remains for the district court to determine what fee is "reasonable." The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" Beard, 31 F.3d at 955 (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). "On both those issues of reasonableness the burden of proof is on the fee applicant." Id. (citing Hensley, 461 U.S. at 437). Moreover, "the district court need not identify and justify every hour allowed or

disallowed, as doing so would run counter to the Supreme Court's warning that a 'request for attorney's fees should not result in a second major litigation.'" Malloy, 73 F.3d at 1018 (quoting Hensley, 461 U.S. at 437).

**a**

**Allowable Hours**

Because not all hours expended in litigation are normally billed to a client, "an applicant should exercise 'billing judgment' with respect to a claim of the number of hours worked." Malloy, 73 F.3d at 1018 (citing Hensley, 461 U.S. at 437). Hence, "'[c]ounsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary' . . . [and the] district court has a corresponding obligation to exclude hours not 'reasonably expended' from the calculation." Id.

The district court first rejected defendants' invitation to summarily deny Ellis's motion for fees in its entirety due to the excessive nature of the request. While the judge agreed that the time submitted was excessive, he did not agree that Ellis's fee request should be denied in its entirety. App. at 201. Given the recognized importance of awarding fees to encourage individuals to vindicate their civil rights, as well as our determination that Ellis is otherwise entitled to such fees, we hold that the judge did not abuse his discretion in denying defendants' request for a blanket rejection of the fee request.

Further, although Ellis makes several claims of error with respect to the district

judge's determination of reasonable hours expended, we do not find that the judge abused his discretion or clearly erred in fixing the total number of allowable hours at 30. With respect to the number of hours reasonably expended to settle this matter, as detailed more fully above, the parties agreed to the settlement almost immediately after this action was filed. Ellis's counsel became involved in this controversy on August 1, 1995, made some attempts to settle the dispute informally, and then filed this action on August 25, 1995. App. at 131-33. Within days of commencing this action, Ellis agreed to a settlement on August 30. As the judge below noted, "[n]otwithstanding this relatively quick and uncomplicated resolution to the parties' dispute, plaintiff did not file her stipulation for dismissal of all claims until May 9, 1996." App. at 202-03. This prolonged delay was motivated by Ellis's desire to preclude any transfer back to the day shift during the school year. Brief of Appellant at 14-15 ("In order to preclude any transfer back to days during the school year, plaintiff's counsel purposefully delayed closing the settlement and dismissing plaintiff's suit, as well as asserting her claim for attorney's fees, until after the spring semester was over at William Jewell College.").

If it had not been for Ellis's desire to delay filing her stipulation for dismissal for almost nine months, thereby causing her attorney to devote more hours to this case, the dismissal could have reasonably been filed, along with the motion for fees, in the early part of September 1995 at the latest. Hence, virtually all hours expended by Ellis's counsel on this case between the settlement date of August 30, 1995, and the filing of the stipulation for

dismissal on May 9, 1996, were unreasonably expended. The judge below found that many of the hours expended by Ellis's counsel in settling this case were "unnecessary and excessive," and the judge concluded that "twenty hours is a closer approximation of the time reasonably required to settle plaintiff's claims." App. at 204. We find this conclusion well-supported and not clearly erroneous.

The district judge similarly found unreasonable the number of hours that Ellis's counsel expended in handling the motion for fees. The judge pointed to Ellis's 65-page memorandum in support of her motion for fees, which was accompanied by six "voluminous" exhibits. App. at 204-05. The judge considered this "65-page memorandum alone to be sufficient evidence that the requested fees are excessive." Id. The judge then concluded that "ten hours represents the appropriate number of hours to expend preparing the request for fees in this action." Id. Given the overall nature of this action, as well as its prompt resolution through settlement, we believe the district court was justified in reducing the number of hours.

Accordingly, we hold that the trial judge's findings as to reasonableness are not clearly erroneous and that his reduction in Ellis's claimed number of hours to 30 was not an abuse of its discretion.

**b**

**Hourly Rate**

After determining the number of hours reasonably expended, a reasonable hourly rate

must be determined. "A reasonable rate is the prevailing market rate in the relevant community." Malloy, 73 F.3d at 1018 (citing Blum v. Stenson, 465 U.S. 886, 895 (1984)). The relevant market value is not necessarily the price which a party's lawyer charged to prosecute the case, but, rather, the market value is "the price that is customarily paid in the community for services like those involved in the case at hand." Beard, 31 F.3d at 956. Thus, Ellis bore the burden of showing that the "requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Malloy, 73 F.3d at 1018 (quoting Blum, 465 U.S. at 895 n.11).

The relevant community is Kansas City, Kansas. App. at 1. And, although Ellis's attorney's billing rate is relevant, it is not conclusive. Ramos v. Lamm, 713 F.2d 546, 555 (10th Cir. 1983). The district court is also authorized to consider the quality of Ellis's counsel's performance in the case when placing a value on his services. Ramos, 713 F.2d at 555. However, as we have recently held, a district court abuses its discretion "when it ignores the parties' market evidence and sets an attorney's hourly rate using the rates it consistently grant[s]." Case, 157 F.3d at 1255 (internal quotations omitted).

In her motion for fees, Ellis requested an hourly rate of $150. The judge held that in "light of the authority, the affidavits, and the court's own familiarity with the relevant rates in the community, the court awards plaintiff's counsel $100.00 an hour . . . ." App. at 207. Ellis complains that the district judge improperly and arbitrarily reduced the requested rate and erred by ignoring undisputed evidence tending to show that the prevailing market rate

36

for services rendered in a case such as the instant one is between $150 and $235 an hour.

In his affidavit Ellis's counsel, John Gage, states that he has been in practice since 1979 and his customary hourly rate is $165. He says, however, that he is charging Ellis his former hourly rate of $150. App. at 119, 123. Ellis also presented evidence from three civil rights attorneys practicing in the Kansas City area: Arthur Benson stated by declaration that he was admitted to the Missouri bar in 1969 and his customary hourly rate is $235, App. at 166-67; Nick Badgerow stated by affidavit that he has practiced law in Kansas City since 1976 and his firm bills his time at $190 an hour, id. at 171, 178; and David Hauber stated by affidavit that he has practiced law in Kansas City since 1983 and his firm bills $150 an hour for work similar to that done in this case. Id. at 186, 189. Each of these attorneys further represented that an hourly rate of $150 is both reasonable and below the market rate for similar work.

We have recently observed that "[t]he first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." Case v. Unified School Dist., 157 F.3d at 1256 (quoting Ramos, 713 F.2d at 555).[21] Moreover, there is no indication that defendants made any attempt to dispute these rates or contradict them by submitting their own evidence as to the prevailing market rate.

---

[21]While the district judge needs evidence in order to determine the prevailing market rate, we stated in Ramos that "the practice of presenting experts to testify to the total fee that should be awarded in a given case is not very helpful." Ramos, 713 F.2d at 555 n.6.

We believe our recent decision in Case controls the resolution of this issue. In Case, the parties presented sworn affidavits that the market commanded an attorney's hourly rates at a certain level. Id. at 1256. The district court ignored the evidence of the market rate and applied a rate it consistently granted in civil rights actions. Id. We reversed, holding that the district court abused its discretion in departing from the competent evidence of the market rate. Id. "The object in awarding a reasonable attorney's fee . . . is to simulate the market where a direct market determination is infeasible." Id. (quoting Steinlauf v. Continental Ill. Corp., (In re Continental Ill. Sec. Litig.), 962 F.2d 566, 572 (7th Cir. 1992)). Under Case, the district court must "award rates compatible with competent, trustworthy evidence of the market." Case, 157 F.3d at 1256. Only if the district court "does not have before it adequate evidence of prevailing market rates may the court, in its discretion, use other relevant factors, including its own knowledge, to establish the rate." Id. at 1257; see also Lucero v. City of Trinidad, 815 F.2d 1384, 1385 (10th Cir. 1987).

We hold the district court abused its discretion in awarding a rate of $100 here. First, the court made only a conclusory explanation therefor that such a rate is reasonable in light of the judge's own familiarity with the market rates in the community, the authorities, and the affidavits. Second, the judge makes no mention of the evidence submitted by Ellis indicating a market rate between $150 and $235. Finally, this evidence was not disputed or otherwise contested by defendants below. While it is true that a district court is "uniquely qualified" to determine the reasonable hourly rate, and "we give great deference to its factual

38

findings," Malloy, 73 F.3d at 1019, without a more detailed statement explaining the reasons for its findings the appearance is given that the judge arbitrarily determined the reasonable rate.

Further, a review of recent decisions from the Kansas district courts reveals that the district judge's hourly rate determination in this case is comparatively low. See Baty v. Willamette Indus., Inc., 985 F. Supp. 1002, 1005 (D. Kan. 1997) (the "court concedes that the $135 rate that the court has applied since 1995 is now too low," and an hourly rate of $145 is reasonable in the Kansas City area); T.Y. by Petty v. Board of County Commissioners of the County of Shawnee, 912 F. Supp. 1416, 1423 (D. Kan. 1995) (hourly rate of $125 is generally reasonable for Topeka civil rights attorneys); Brown v. Unified Sch. Dist. No. 501, Shawnee County, Kan., 878 F. Supp. 1430, 1436 (D. Kan. 1995) (same); Franz v. Lytle, 854 F. Supp. 753, 756 (D. Kan. 1994) (hourly rate of $125 reasonable for Wichita area); Campbell v. Kansas St. Univ., 804 F. Supp. 1393, 1397 (D. Kan. 1992) (hourly rates of $112 and $135 reasonable for civil rights attorneys). We are therefore left with the compelling inference that the finding of $100 as a reasonable rate is arbitrary.

Accordingly, we hold that the judge abused his discretion in reducing Ellis's requested fees from $150 to $100 an hour, and therefore remand for reconsideration on this issue. See Malloy, 73 F.3d at 1017 (citing Hensley, 461 U.S. at 437) (district court should provide a clear, concise explanation of its reasons for the fee award).

## III

## Conclusion

The district court's rulings with respect to Ellis's motion for extension, Ellis's entitlement to fees, and the number of allowable hours are **AFFIRMED**. We **REMAND** with instructions to dismiss the state agencies as defendants and for reconsideration of the reasonable hourly rate for fees and entry of a new judgment for attorneys' fees and costs based thereon. See n.12, supra.

Nos. 96-3343, 96-3344, Ellis v. University of Kansas Medical Center

**BALDOCK**, Circuit Judge, concurring.

While I concur, I write separately to express my views on the effect of the settlement agreement upon Plaintiff's claim for attorneys' fees. An ounce of prevention is worth a pound of cure. A comprehensive settlement agreement explicitly addressing the issue of attorneys' fees would have prevented this appeal. Nevertheless, where the settlement agreement is silent as to attorneys' fees, I agree that the intent of the parties governs. I can, however, foresee circumstances in which a general release in a settlement agreement may be so sweeping as to establish that the parties intended to resolve all claims, including attorney's fees. See Muckleshoot Tribe v. Puget Sound Power & Light, 875 F.2d 695, 698 (9th Cir. 1989) ("[i]f the decree contains an explicit reference to fees or the breadth of the release is so 'sweeping' that it necessarily includes attorneys' fees, a waiver may be found") (internal citations omitted); see also Elmore v. Shuler, 787 F.2d 601, 602 (D.C. Cir. 1986) ("[i]n view of the sweep of the release, we hold that it was incumbent on plaintiffs . . . explicitly to reserve the issue of attorneys' fees in order to remove that matter" from the settlement agreement).

This is not such a case, however. Although the settlement agreement in this case is certainly broad enough to resolve the issue, the surrounding circumstances compel the conclusion that the parties did not intend to resolve the attorneys' fees claim. Namely, the record shows that the settlement negotiations contained no reference to attorneys' fees, and Plaintiff's counsel represented to the magistrate judge that all claims, except for attorneys'

fees, had been resolved.  Without these accompanying facts, the release itself would be sufficient to waive attorneys' fees.